ESTATE OF AUGUSTA C. NOLAND, DECEASED, MILDRED N. PEAKE, EXECUTRIX, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Noland v. Comm'r
Docket Nos. 29191-81, 29192-81. United States Tax Court
T.C. Memo 1984-209; 1984 Tax Ct. Memo LEXIS 467; 47 T.C.M. (CCH) 1640; T.C.M. (RIA) 84209; April 24, 1984. *467 In 1973, the decedent transferred stock to her four daughters as part of a settlement of litigation involving a bitter family dispute. In return she received, among other things, a release from all claims against her and broad powers to consume principal as well as income of a real estate trust. Held, the transfer of stock was made for an adequate and full consideration in money or money's worth and was not a taxable gift. Stock transferred by decedent to one daughter was not transferred on corporation's books but as dividends were delivered to the daughter, she deposited them in the decedent's bank account. Held,further, the value of stock is not includible in the decedent's gross estate under section 2036 because the transfer was made for adequate consideration, and there was no express or implied understanding reached contemporaneously with the transfer between the daughter and the decedent that the decedent should retain enjoyment of the property. Under the terms of trust decedent could demand an annual sum from income or principal. In each year from 1973 through 1977, she withdrew less than the minimum amounts available. In 1978, she withdrew no funds from *468 the trust. Held,further, the undrawn amounts were not includible in estate as debts due decedent at her death but the decedent held a general power of appointment over the unclaimed amounts which was not limited by an ascertainable standard. Held,further, the amount includible in her gross estate is subject to the lapse limitation of section 2041(b)(2). Lee C. Bradley, Jr., for the petitioner. Jillena A. Warner, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: The respondent determined that in Docket Number 29192-81 there was a deficiency in the gift tax due from Augusta *470 C. Noland, deceased, for the year 1973 in the amount of $34,067.75 and that in Docket Number 29191-81 there was a deficiency in the estate tax due from the Estate of Augusta C. Noland in the amount of $13,062.26. The cases have been consolidated for trial, briefing, and opinion. The issues for decision are: (1) whether the transfer of 714 shares of stock in Commercial Realty Company by Augusta C. Noland to her four daughters constituted taxable gifts; (2) whether 285 shares of stock in Realty Investment Planning, Inc., are includible in the gross estate of the decedent; and (3) whether the gross estate of the decedent includes $18,674.50 in accumulated amounts which the decedent could have withdrawn from a trust, but which were not withdrawn at the date of her death. FINDINGS OF FACT Some of the facts have been stipulated.The stipulations together with the attached exhibits are incorporated herein by reference. Augusta C. Noland, a resident of Birmingham, Alabama, died testate on January 19, 1978. She was survived by four daughters, Mildred N. Peake, Rosalie N. Gambrill, Augusta N. Bell, and Louis N. Townsend. One of the daughters, Mildred N. Peake, qualified as the executrix *471 of her estate. The executrix was also a resident of Birmingham when the petitions were filed in these cases. Augusta C. Noland was the daugther of General Louis V. Clark.During his life, he transferred to her all 5,000 shares of the stock outstanding in Commercial Realty Company, an Alabama corporation, which owned several parcels of real property.At his death, his will, which was probated on March 27, 1964, gave all of his assets both real and personal to Augusta C. Noland "for life and at her death, share and share alike to her children." Mrs. Noland was the executor of his estate, which also contained several parcels of real estate. Over a period of years Mrs. Noland gave stock in Commercial Realty Company to each of her four daughters until by September 13, 1971, the date upon which the litigation described hereinafter was commenced, the stock was held as follows: Name
Shares
Percentage of Ownership
Mrs. Peake
1,073
21.46%
Mrs. Gambrill
1,071
21.42%
Mrs. Townsend
1,071
21.42%
Mrs. Bell
1,071
21.42%
Mrs. Noland
714
14.28%
TOTALS
5,000
100.00%
For several years prior to the commencement of such litigation, Mrs. Noland served *472 as the president and chief executive officer and as a director of Commercial Realty Company. B. Wayne Peake, the husband of Mildred N. Peake, was the vice-president and general manager of the company. Each of the daughter and their respective husbands were also directors thereby constituting a board of nine members. During the same period, Mrs. Noland, as executor and life tenant of her father's estate, used, controlled, and looked after its assets including the real properties contained therein. The stock of Commercial Realty Company was subject to an agreement entered into in 1954 by Mrs. Noland, the four daughters, and the corporation. In the agreement (1) each daughter agreed that she would not sell, hypothecate, or otherwise encumber her stock in the corporation except as provided in the agreement; (2) each daughter agreed that if she ever desired to sell her stock she would first offer it to the corporation at its book value and give the corporation 30 days within which to accept or reject the offer; and (3) each daughter also agreed that at her death the corporation would have the right and option to buy her stock at its book value. On September 13, 1971, Rosalie N. *473 Gambrill and Augusta N. Bell filed a complaint in the Circuit Court for the Tenth Judicial Circuit of Alabama, against Commercial Realty Company, Mildred N. Peake, B. Wayne Peake, and Louis N. Townsend. Subsequently, the Circuit Court found that Augusta C. Noland was an essential party to the suit and thereupon the complaint was amended to name her as an additional defendant. The complaint [1] alleged that on or before June 6, 1971, Mrs. Noland, while under undue influence from the Peakes, entered into a voting trust agreement with Mildred N. Peake and Louis N. Townsend under the terms of which actual control of Commercial Realty Company had been given to Mildred N. Peake by allowing her to vote all of the shares in the company owned by Mrs. Peake, Mrs. Townsend, and Mrs. Noland. It also alleged that through the exercise of the voting trust agreement, Commercial Realty Company was then in the process of guaranteeing certain debts tataling more than $160,000 of Louis N. Townsend to The First National Bank of Birmingham and other creditors and that Commercial Realty Company was being empowered to guarantee loans made to Mrs. Noland. *474 The complaint further alleged that through the exercise of the voting trust agreement at a meeting of the stockholders which was held on June 6, 1971, the defendants had caused George T. Gambrill and Frederick Bell to be removed from the board of directors of Commercial Realty Company; that certain stock certificates had been reissued to Louis N. Townsend and pledged by her to The First National Bank of Birmingham in violation of the restrictions set out in the 1954 agreement between the parties; that loans totaling $33,000 to $40,000 had been improperly made by Commercial Realty Company to Louis N. Townsend; and that through the exercise of the voting trust agreement, very broad authority over the business of the corporation had been granted to B. Wayne Peake including the unrestricted power to dispose of the corporation's real estate. On the same day that the complaint was filed, the Circuit Court enjoined the defendants from carrying out any of the alleged actions including the guaranteeing of stockholder debts, the selling of corporate real estate, the implementation of the voting trust agreement, and the granting of any special authority to B. Wayne Peake.This injunction *475 remained in effect until the litigation was finally settled. Shortly after the lawsuit was filed, Augusta C. Noland by letter [2] advised Rosalie N. Gambrill and Augusta N. Bell, the complainants, that she was revising her will in such a manner as to disinherit them. In an attempt to dispose of the bitter stalemate which had developed, protracted negotiations were conducted among the parties, each of whom was separately represented by independent and competent counsel. Finally, on December 6, 1972, each of the parties and their separate counsel executed a document entitled Memorandum of Understanding which, among other things, provided that if the settlement of their differences as set forth therein was approved by the Circuit Court, the parties would exchange releases containing the following provision: Each of the parties hereto, separately, severally and jointly, releases each of the parties hereto and the parties hereto, separately, severally and in all fiduciary capacities (including the Clark Estate), release each other of and from all claims, actions, causes of action and demands of all kinds and natures whatsoever, presently and heretofore existing and hereby settles, *476 compromises and disposes of all claims, actions, causes of actions and demands and all differences have been fully and finally settled and disposed of in all respects.
The Memorandum of Understanding was approved by the Circuit Court in a preliminary decree [3] which included the following findings: (1) For many years the parties, who are the principals in the Commercial Realty Company, have been having serious disputes and personality conflicts, have employed attorneys, made accusations against each other, argued and disagreed with each other, all to the disruption of the corporate business; and it is necessary from a corporate business standpoint for Commercial Realty Company to be divided into corporately independent units as provided for in this said Memorandum of Understanding; and * * * (3) The aforesaid Memorandum of Understanding is approved and incorporated in and made part of this decree. (4) All parties are directed and ordered to proceed with diligence to implement and carry forward the several provisions of the Memorandum of Understanding and report such action to the Court for a final settlement order in this cause. *477 Briefly stated, the pertinent provisions of the settlement as set forth in the Memorandum of Understanding and as carried out by the parties, were as follows: (1) Mrs. Noland transferred her remaining 714 shares of Commercial Realty Company to the four daughters in equal shares so that immediately thereafter Mrs. Noland held no stock in Commercial Realty Company and each of the four daughters held 1,250 shares; (2) Commercial Realty Company was then divided into three separate corporations in the following manner: (a) 25 percent of the assets of Commercial Realty Company were transferred to a new corporation known as Townco, all of the stock in Townco was issued to Louis N. Townsend, and all of her outstanding stock in Commercial Realty Company was surrendered and cancelled; (b) 25 percent of the assets of Commercial Realty Company were transferred to a second corporation known as Realty Investment Planning, all of the stock in Realty Investment Planning was issued to Mildred N. Peake, and all of her stock, in Commercial Realty Company was surrendered and cancelled; and (c) the other 50 percent of the assets of Commercial Realty Company remained in Commercial Realty Company and *478 all of its outstanding stock after the cancellation of the shares theretofore held by Mrs. Townsend and Mrs. Peake were held in equal shares by Rosalie N. Gambrill and Augusta N. Bell; (3) All of the parties executed an Indenture of Trust by which the Clark Estate was conveyed to a local bank as trustee under a trust which was to continue until ten years after the death of Mrs. Noland unless it was terminated by the unanimous consent of all of the parties. Article One of the trust provided in part as follows: The Trustee shall hold said Trust for the primary use and benefit of Augusta C. Noland (hereinafter sometimes referred to as the primary beneficiary) for and during her lifetime. During such period the Trustee shall pay to said primary beneficiary up to a "minimum sum" of $25,000.00 per annum in amounts and at times as requested by the primary beneficiary. This minimum sum shall be taken first from net income from the properties of the Trust, but if this shall be insufficient, then the Trustee is directed to apply working capital of the properties, or if this be insufficient, proceeds from new loans or mortgages or proceeds from the sale or principal assets to this purpose. *479 The primary intent of this Trust is toprovide for the needs of Augusta C. Noland during her lifetime. If, therefore, after use of income producing resources otherwise available to her, Augusta C. Noland shall, in the judgment of the Trustee independently exercised, require more funds than the aforesaid minimum sum for her support, maintenance, health, hospital or medical care in full accord with her aforesaid accustomed mode of living, then the Trustee shall pay to Augusta C. Noland such additional sum or sums out of the income and principal of the trust (to the exhaustion of same if required). All such payments of minimum sums and other funds shall be used for Augusta C. Noland and no other Grantor shall attempt in any way to acquire any part thereof. After the death of Mrs. Noland, the trust was to continue as four separate trusts, one for each daughter, with each daughter being entitled to receive the income from her separate trust. (4) Mrs. Noland agreed to, and thereafter did, revise her will so as to again include Mrs. Gambrill and Mrs. Bell and to treat the four daughters equally in the disposition of her testamentary estate. (5) All four daughters and their husbands *480 joined in the guarantee of the mortgage on Mrs. Noland's home which had theretofore been guaranteed only by Mr. and Mrs. Peake. The settlement set forth in the memorandum was carried out by the parties, including the division of Commercial Realty Company and the execution of the trust for the Clark Estate and the settlement was approved in a final decree entered by the Circuit Court on June 21, 1974. In its final decree, the Circuit Court also approved the various other actions taken by the parties in carrying out the settlement, including the dismissal of the litigation; the termination of the voting trust; the termination of the 1954 agreement; and the restoration of the ousted members of the board of directors of Commercial Realty Company. The Court also assigned costs; directed the payment of certain expenses by the three corporations and the four daughters; and granted each party the general release set out hereinbefore, except for any rights pertaining to the trust for the Clark Estate. As indicated above, Mildren N. Peake was entitled, as part of the settlement, to all of the stock in Realty Investment planning. For some reason not entirely clear from the record, the *481 certificates representing her stock in Realty Investment Planning were actually issued to her mother, Augusta C. Noland, who executed the certificates for transfer to Mrs. Peake and delivered them to her. The 285 shares of stock, however, were not transferred on the books of the corporation and remained outstanding in the name of Mrs. Noland until her death. The dividends paid on the stock during the balance of Mrs. Noland's life were delivered to Mrs. Peake but were deposited by her in Mrs. Noland's bank account. As the primary beneficiary of the trust for the Clark Estate, Mrs. Noland never requested or received the full sum available to her under Article One of the trust for any year during the remainder of her life. Furthermore, in each year of her life the net income of the trust was more than sufficient to cover the amounts which were paid to her and, as a result, no part of the corpus of the trust was used for such purpose. The following table reflects the amounts payable, the amounts actually paid, and the unpaid balances for each of the years following the creation of the trust in April of 1973 until her death in January of 1978: Period
Amount Payable
Amount Paid
Unpaid Balance
Apr. 1973-Dec. 1973
$16,667.00
$15,629.25
$1,037.75
Calendar Year 1974
25,000.00
22,433.26
2,566.74
Calendar Year 1975
25,000.00
21,799.18
3,200.82
Calendar Year 1976
25,000.00
17,195.08
7,804.92
Calendar Year 1977
25,000.00
20,935.73
4,064.27
TOTALS
$116,667.00
$97,992.50
$18,674.50
Calendar Year 1978
$25,000.00
0
$25,000.00
*482 In the notice of deficiency in Docket Number 29191-81, the respondent determined that the $18,674.50 which the decedent failed to request from the trust during the years 1973 through 1977 was includable in the gross estate as a debt due the decedent at her death. The respondent also determined that the 285 shares of stock in Realty Investment Planning was includable in the gross estate under section 2036 [4] because the decedent had retained for her lifetime the right to receive the income from the stock. In the notice of deficiency in Docket Number 29192-81, the respondent determined that the transfer by the decedent to her daughters of her 714 shares of stock in Commercial Realty Company under the Memorandum of Understanding constituted a gift because there was no consideration in money or money's worth for the transfer. OPINION The Transfer of Stock
The parties agree that the decedent, Augusta C. Noland, transferred her 714 shares of stock in Commercial *483 Realty Company to her four daughters pursuant to the Memorandum of Understanding which was entered into in the settlement of the bitter family dispute over the operation of the company and the administration of the Clark Estate. The respondent determined that the transfer of the stock was made for an inadequate consideration and, therefore, the transaction constituted a taxable gift. The petitioner contends that the transfer was made for an adequate and full consideration in money or money's worth and, consequently, no taxable gift was made. [5]
Section 2512 provides that when property is transferred for less than an adequate and full consideration in money or money's worth, the excess of the value of the property over the consideration received is a gift. On the other hand, "a sale, exchange, or other transfer of property made in the ordinary course of business [a transaction which is bona fide, at arm's length, and free from any donative intent], will be considered *484 as made for an adequate and full consideration in money or money's worth." Sec. 25.2512-8, Gift Tax Regs. In , a widow transferred property to her stepchildren in settlement of claims they filed asserting their right to property from her husband's estate. The Court held that the transfer was a business exchange, and that even though the claims by the stepchildren were unliquidated, their release had a recognizable value in money or money's worth. Although the settlement was reached prior to litigation, it was based upon the advice of independent counsel and was presumed to be economically advantageous to all of the parties. We stated: Gertrude and the children were in serious disagreement over the content of Jacob's estate.The children further believed that they were entitled to at least a part of the Florida and Indiana properties and apparently were willing to institute suit to determine their rights. Gertrude might successfully have resisted this suit, but, as with all litigation, the outcome could not be predetermined.The settlement was made upon advice of her attorney under circumstances which it may be assumed *485 both Gertrude and her attorney regarded as "advantageous economically." Therefore, it is our view that the transfer by Gertrude of a remainder interest in the properties in question was made for an adequate and full consideration in money or money's worth. . See also and (W.D. mo. 1966). [6]
Similarly, in , appeal dismissed (4th Cir. 1948), a taxpayer's transfer of $120,000 to a trust for the benefit of her estranged daughter in settlement of a threatened lawsuit by the daughter was held to be a transfer for an adequate consideration within the meaning of the gift tax statutes. In the instant case, we are satisfied that Mrs. Noland had no donative intent because she was not motivated by love and affection or other thoughts which normally prompt the making of a gift. She and her attorneys obviously regarded the settlement *486 as economically advantageous under the circumstances. First, in the settlement, the decedent was given greater lifetime benefits in the Clark Estate. Under the will of her father, she was entitled only to the income from the properties but under the settlement she could upon demand withdraw income or corpus up to $25,000 a year. In addition, the trustee was authorized to pay her additional amounts of income or corpus for her health, maintenance and support even if such payments totally exhausted the estate. Second, under the settlement Mrs. Noland received six additional guarantors for the mortgage on her home. Third, the broad release incorporated in the final decree freed her from liability for any breach of duty as a life tenant or fiduciary of the Clark Estate as well as the principal executive officer and director of Commercial Realty Company. The possible breaches included allegations that the estate had received substantial loans from the corporation while the decedent was a fiduciary of both, and that while the decedent was the principal executive officer of the corporation substantial corporate funds had been misused through unauthorized loans to the daughter, Louis *487 N. Townsend. In addition, daughters Bell and Gambrill had alleged that the decedent, by executing the voting trust, permitted the other defendants to violate the 1954 agreement so as to shift control of the corporation to Mildred Peake and her husband. The settlement also relieved her from any liability for these alleged wrongdoings. Significantly, the settlement was finalized under the supervision of and pursuant to a decree of the Circuit Court. In fact, the final decree actually incorporated the compromise settlement as agreed to by the contesting litigants on the advice of their separate and independent counsel. A transfer under such circumstances in no realistic sense constitutes a gift subject to tax. ; ;
The only case relied upon by the respondent, , affd. , cert. denied , is distinguishable on its facts. In Housman, payments were made to a son to avoid a will contest. *488 However, the Court found that the parties were not hostile, did not deal at arm's length, and did not compromise a bona fide will contest.The Court also found that the son's claim involved only a moral obligation and not a legally enforceable one. By contrast, in this case the Circuit Court specifically held that the decedent was a necessary party to the litigation, that the complaint stated a sufficient cause of action against her, and that the terms of the settlement were to be incorporated in the final decree. In view of all of the foregoing, we conclude that the transfer of the stock in Commercial Realty Company by the decedent to her daughters constituted part of a bona fide arm's length transaction which was free from donative intent and was made for a full and adequate consideration in money or money's worth. The transfer, therefore, did not constitute a taxable gift. Retained Lief Interest
Under the settlement agreement, Mildred N. Peake was to receive all of the stock in Realty Investment Planning. In some manner which does not appear from the record, certificates for the 285 shares of Realty Investment Planning were issued to the decedent who executed and *489 delivered the certificates to Mrs. Peake. Mrs. Peake held the stock certificates throughout the life of her mother, but no transfer of the stock was made on the books of the corporation. Mrs. Peake testified that when dividends were paid on the stock she deposited the dividends in her mother's checking account; that this was a voluntary action on her part which was never mentioned to or discussed with her mother; and that she never reported the dividends in any gift tax return.[7]
Section 2036(a)(1) provides that the value of the gross estate shall include the value of all property transferred by trust or otherwise with respect to which the decedent has retained for his life or for any period which does not in fact end before his death the possession or enjoyment of or the right to income from the property. However, section 2036(a)(1) will not apply unless the decedent retains enjoyment of the transferred property pursuant to an understanding or agreement reached contemporaneously with the transfer. ; *490 . Section 20.2036-1(a), Estate Tax Regs., provides as follows: An interest or right is treated as having been retained or reserved if at the time of the transfer there was an understanding, expressed or implied, that the interest or right would later be conferred. The existence of such an agreement can be inferred from the facts and circumstances surrounding the transfer and subsequent use of the property. . The agreement need not be legally enforceable or evidence by the instrument to transfer. In the instant case there is no evidence of an express agreement between the decedent and Mrs. Peake regarding the dividends or of an agreement by Mrs. Peake that she would refrain from transferring the stock on the corporate books. From this record we are unable to find an implied agreement on such matters. Mrs. Peake testified that she voluntarily deposited the dividend payments in her mother's checking account, which she handled for her mother from January of 1973 until *491 she died in 1978. Respondent offered no evidence which tended to discredit or contradict this testimony, and we find it creditable and persuasive. Moreover, section 2036 contains an exception for a retained life interest arising in connection with a bona fide sale for an adequate and full consideration in money or money's worth. The term "sale" includes exchanges and other transfers. ; . In , it was held that where a decedent transferred land and reserved a life estate in settlement or a valid family dispute, the property was not includible in her gross estate under section 2036 because the transfer was for an adequate consideration. Since we have concluded in this case that the transfer made by the decedent to Mrs. Peake was for an adequate consideration in settlement of a bitter family dispute then under the specific exception set forth in the statute, any lifetime interest which might have been retained *492 is not sufficient to cause the stock to be included in the estate under section 2036. The Amounts Due from Trust of Clark Estate
Pursuant to the terms of the settlement, the Clark Estate was placed in a trust under which the decedent was given a life interest. Under its terms, she was authorized to withdraw from the trust up to a minimum sum of $25,000 a year, at will, and if that were insufficient, then additional funds as required could be withdrawn for her support and maintenance or to provide her with health, hospital or medical care. These amounts were to be paid first out of income and then, if necessary, from corpus. From 1973, when the trust was created, through 1977, Mrs. Noland withdrew less than the minimum sum each year. All amounts withdrawn came from trust income. She requested no funds from the trust in 1978, the year of her death. The respondent, in his statutory notice, included in the gross estate the cumulative undrawn amounts through 1977 of $18,674.50 as a debt due the decedent. On this point he relies upon , revd. on another issue sub. nom . *493 In the alternative, respondent now argues on brief that unclaimed amounts for all six years are includable in the decedent's estate on the grounds that she held a general power of appointment as to these funds which was not limited by an ascertainable standard. The petitioner contends that the right to withdraw the minimum sum was a personal right of the decedent which expired or lapsed at the end of each year so that the unclaimed amounts through 1977 were not receivables at her death in 1978. She further argues that the minimum sum was limited by an ascertainable standard, and that in any event, under the lapse of power provisions of section 2041(d)(2), the maximum amount that could be included in the estate for each year would be the excess over the greater of $5,000 or five percent of the value of the trust property. In , the decedent was the beneficiary of a trust which so far as is pertinent here provided that upon her death any net income then accrued should be paid to her estate and the corpus should be paid to her lawful descendants in such proportions as she should by last will appoint. The *494 Board of Tax Appeals held that the accrued income constituted part of her gross estate as a debt due the estate. By contrast, the trust indenture before us contains no such provision with respect to accrued income, or accrued but unpaid withdrawals. Instead, upon Mrs. Noland's death, all trust funds were first to be applied to any indebtedness of the Clark Estate and then held in trust for the four remaindermen. From the plain language of the agreement, we agree with petitioner that the right of the decedent to annually request funds was not an obligation enforceable by the estate.We conclude, therefore, that the decedent's right to withdraw up to $25,000 from the trust "per annum" was a non-cumulative, personal right which expired or lapsed at the end of each year. Thus, the unclaimed amounts for 1973 through 1977 were not owed to her estate at her death in 1978. In his alternative contention, respondent argues that the unpaid amounts are includable in the estate because the decedent held a general power of appointment over the unclaimed funds for 1973 through 1978. Section 2041(a)(2) requires that the value of property subject to a general power of appointment created after *495 October 21, 1942 be included in the decedent's gross estate. Section 2041(b)(1) defines a "general power of appointment" as a power exercisable in favor of the decedent, his estate, his creditors, or the creditors of his estate. However, section 2041(b)(1)(A) provides that "[a] power to consume, invade, or appropriate property for the benefit of the decedent which is limited by an ascertainable standard relating to the health, education, support, or maintenance of the decedent shall not be deemed a general power of appointment." In this case, Mrs. Noland as the life beneficiary of the trust had the power to request up to $25,000 each year out of income or principal. Therefore, to the extent of $25,000 per year [8] she possessed a general power of appointment as defined in section 2041(b)(1), unless the power was limited by an ascertainable standard. A power is limited by such a standard "if the extent of the holder's duty to exercise the power is reasonably measurable in terms of his needs for health, education, or support (or any combination of them)." Section 20.2041-1(c)(2), Estate Tax Regs. *496 The determination of what legal rights and interests in property are created by a specific instrument is a question of state law. ; . In determining whether the decedent in this case had a general power over the minimum sum, we must look to the express language of the instrument as interpreted by Alabama law, if any. ; . The trust instrument contains the following unequivocal and unambiguous language: The Trustee shall hold said Trust for the primary use and benefit of Augusta C. Noland (hereinafter sometimes referred to as the primary beneficiary) for and during her lifetime. During such period the Trustee shall pay to the said primary beneficiary up to a 'minimum sum' of $25,000.00 per annum in amounts and at times as requested by the primary beneficiary. This minimum sum shall be taken first from net income from the properties of the Trust, but if this shall be insufficient, then the Trustee is directed to *497 apply working capital of the properties or if this be insufficient, proceeds from new loans or mortgages or proceeds from the sale or principal assets to this purpose. It is difficult to imagine a more unqualified power than this. Moreover, the petitioner has not cited nor have we found any Alabama case law or statute which tends to place a support and maintenance limitation on this part of the trust. [9] We conclude, therefore, that during each year Mrs. Noland had a general power of appointment over the trust of up to $25,000. We have found hereinbefore that the decedent's power of appointment expired, or lapsed, at the end of each year to the extent that it was not exercised during that year. *498 As a general rule the lapse of a power of appointment is includible in the estate of a decedent as a release of the poser of appointment. Section 2041(b)(2). Except, however, that the lapse of a power of appointment during any calendar year during the decedent's life is treated as a release for purposes of inclusion in the gross estate under section 2041(a)(2) only to the extent that the property which could have been appointed by the exercise of the lapsed power exceeds the greater of $5,000 of five percent of the aggregate value at the time of the lapse of the assets out of which the lapsed power could have been satisfied. Section 2041(b)(2); section 20.2041-3(d)(3), Estate Tax Regs. Therefore, under section 2041(b)(2), the amount includible in the gross estate in this case for each of the years 1973 through 1978 is limited to the amount, if any, by which the lapsed portion of the power exceeded $5,000. [10]
With respect to the year 1978, the respondent has argued for the first time on brief that the *499 decedent held a general power of appointment at the time of her death for the entire $25,000 which she could have withdrawn during that year.The respondent states, however, that he does not wish to increase the amount of the deficiency in estate tax beyond the amount originally asserted in the deficiency notice, which was based upon the $18,674.50 in unclaimed trust funds for the years 1973 through 1977. In her brief, the petitioner objects to the inclusion of the $25,000 for the year 1978 on the grounds that this is a claim for an additional deficiency which was not pleaded by the respondent and therefore should not be considered. The parties stipulated, however, that the entire $25,000 was available to her for the calendar year 1978 although she withdrew no funds during that year because of her death on January 19, 1978. Furthermore, their stipulation provides in part that "[a]ll stipulated facts shall be conclusive * * *" and that "except for relevancy, all objections to this stipulation and its exhibits are expressly waived unless stated in this stipulation." Inasmuch as the respondent has agreed to limit the deficiency in estate tax to the amount set out in the notice *500 and inasmuch as both parties were aware of the situation with respect to the $25,000 being available for 1978 as reflected by their stipulation, we are satisfied that respondent's contention based upon a power of appointment for the year 1978 does not constitute an increase in the deficiency and does not prejudice the petitioner. To reflect the foregoing, and the concessions made by the parties, including the concession made by the respondent with respect to the deficiency in estate tax and to allow for additional deductible expenses chargeable to the estate as well as the possibility of an overpayment in the estate tax, Decisions will be entered under Rule 155.
Footnotes
1. At the trial, respondent objected to the admissibility of this document as proof of the statements made therein. For this purpose the document is hearsay, is not admissible, and has not been considered. The document, however, is admissible and has been considered as proof of the circumstances surrounding the transactions between the parties.↩
2. See footnote 1, supra.↩
3. See Footnote 1, supra.↩
4. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
5. After a motion to intervene was denied, counsel for Rosalie N. Gambrill and Augusta N. Bell made a statement for the record at trial and filed a brief and reply brief amicus curiae in support of petitioners.↩
6. See also Chase National Bank of the City of New York v. Commissioner,↩ a Memorandum Opinion of this Court, dated April 28, 1953.
7. The record contains no evidence which tends to establish that the amount of such dividends exceeded the applicable annual exclusion from gift tax.↩
8. Respondent does not contend that the general power exceeds $25,000 per year because Mrs. Noland's right to receive any sum from the trust in excess of $25,000 per year was within the independent judgment of the trustee that such sum was required "for her support, maintenance, health, hospital or medical care."↩
9. Indeed, the trustee, in responding to a question about the distribution clause, wrote to Mrs. Peake: We have always interpreted this trust to mean that the Trustee shall pay to Mrs. Noland any amount which she requested up to $25,000 and that we were under no duty to ascertain why she requested the money or what she did with the money. We delieve the key words are "up to" and that the trust instrument simply says that we shall pay her that amount of money if requested by her.↩
10. Petitioner did not offer any proof as to the value of the trust properties at the end of the various years. Thus, the exemption is limited to $5,000. Rule 142(a).↩