ESTATE OF EDWARD S. REDSTONE, DECEASED, MADELINE M. REDSTONE, EXECUTRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8401–13.          Filed October 26, 2015.

R determined a gift tax deficiency against E, the estate of D, a deceased individual. D worked in a family business with his father and his brother. This business was reorganized in 1959 as National Amusements, Inc. (NAI). Upon NAI's incorporation, D's father contributed a disproportionate amount of capital, but the three were each listed as registered owners of ⅓ of NAI's shares. D was eventually forced out of the business. Upon departure he demanded all of his stock, which his

father refused to deliver. Citing the disproportionate capital contributions in 1959, his father insisted that a portion of D's stock had been held since NAI's inception in an "oral trust" for the benefit of D's children. After lengthy negotiations and the filing of two lawsuits, the parties in 1972 reached a settlement on advice of their respective counsel. Pursuant to the settlement, D transferred ⅓ of the disputed shares into a trust for his children, in consideration of which D was acknowledged as outright owner of ⅔ of the disputed shares, which NAI redeemed for $5 million. R determined that D's transfer of stock for the benefit of his children was a taxable gift. While agreeing that D transferred the stock in settlement of a bona fide dispute, R contends that the transfer was not made "in the ordinary course of business" or "for a full and adequate consideration in money or money's worth," sec. 25.2511–1(g)(1), Gift Tax Regs., because no consideration was furnished by D's children, the transferees of the stock.

1. *Held*: D's transfer of stock was made in the ordinary course of business and for a full and adequate consideration in money or money's worth, namely, recognition by D's father and brother that he was the outright owner of ⅔ of the disputed shares.

2. *Held*, *further*, D received adequate consideration even though that consideration was not furnished by his children.

3. *Held*, *further*, D did not make a taxable gift and is not liable for any gift tax for the period at issue.

*Howard J. Castleman* and *Loretta R. Richard*, for petitioner.

*Carina J. Campobasso* and *Janet F. Appel*, for respondent.

LAUBER, *Judge*: Respondent determined a deficiency of $737,625 in the Federal gift tax of the Estate of Edward S. Redstone, Deceased (estate) for the calendar quarter ended June 30, 1972. Respondent also determined an addition to tax of $368,813 under section 6653(b) for fraud and (alternatively) an addition to tax of $36,881 under section 6653(a) for negligence and an addition to tax of $184,406 under section 6651(a)(1) for failure to file a timely gift tax return. [1]

The deficiency stems from the settlement in 1972 of a family dispute concerning Edward Redstone's ownership of shares in National Amusements, Inc. (NAI), a family-owned

---

[1] All statutory references are to the Internal Revenue Code in effect for the tax period at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar. During 1972, the tax period at issue, what are now "penalties" for fraud and negligence were denominated "additions to tax."

corporation. This dispute was settled by a compromise whereby Edward released his claim to 33⅓ NAI shares, which at his father's insistence were placed in trusts for Edward's children. In exchange for this release, Edward's father and brother acknowledged Edward's ownership of 66⅔ NAI shares, which NAI immediately redeemed for cash. The focus of the parties' dispute is whether Edward's transfer of stock in trust for his children was made for "an adequate and full consideration in money or money's worth." *See* sec. 2512(b). We find that it was. We accordingly hold that the 1972 transfer was not a "gift" for Federal gift tax purposes.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated by this reference. Edward Redstone died on December 23, 2011. Edward married Madeline Redstone in 1989, and she is his surviving spouse and the executrix of the estate. Madeline was a California resident at the time the petition was filed.

### Family and Business Background

Michael "Mickey" Redstone was born on April 11, 1902. He married Belle Redstone, and the couple had two children, Sumner and Edward. Edward attended college and business school before joining the family business in 1952. He married Leila, his first wife, who died in 1987. They had two children, Michael and Ruth Ann.

Sumner graduated from Harvard College in 1944 and Harvard Law School in 1947. He practiced law for several years, including a stint in the Tax Division of the U.S. Department of Justice, before starting work in 1954 for the family business. Sumner married Phyllis, and they had two children, Brent and Shari.[2]

---

[2] Sumner is the petitioner in a companion case, *Redstone v. Commissioner*, T.C. Dkt. No. 8097–13 (filed Apr. 10, 2013). That case has not been consolidated with the instant case. While the cases share a common factual background, they present different issues, the resolution of which depends to a large degree on different evidence.

Mickey entered the drive-in movie theater business in 1936. Between 1936 and 1954 Mickey bought real estate throughout the Northeast and built numerous drive-in theaters. He incorporated Northeast Theatre Corporation (Northeast) in 1954, and it became the management company for the Redstone family business. For each drive-in theater, Mickey typically incorporated three separate corporations: one to own the real estate, one to operate the theater, and one to manage refreshments. Mickey, Edward, and Sumner eventually came to own various percentages of these various corporations, with Mickey's aggregate share being the largest.

As the family business grew, this complex corporate structure made it cumbersome to obtain financing. To solve this problem and to consolidate the interests of Mickey, Edward, and Sumner in a single entity, NAI was incorporated as a holding company on August 28, 1959. Its articles of incorporation named Mickey, Edward, and Sumner as the original directors; Mickey was elected president, Sumner vice president, and Edward secretary-treasurer. To this date NAI is a closely held corporation headquartered in Norwood, Massachusetts.

Upon NAI's incorporation, Mickey, Edward, and Sumner each contributed to it their stock in the pre-existing movie companies. The book value of the stock that each contributed was $30,328, $17,845, and $18,445, respectively. Mickey also contributed $3,000 in cash. According to the minutes of the first meeting of directors dated September 1, 1959, a total of 300 shares of class A voting common stock were to be issued: 100 shares each to Mickey, Edward, and Sumner. It was Mickey's decision to divide the shares evenly. Consistently with these decisions, the stock certificates indicated that Mickey, Edward, and Sumner were each registered owners of 100 unrestricted shares of NAI common stock. All of the physical stock certificates were retained in NAI's corporate office.

The decisions taken at NAI's organizational meeting contained the seeds of the problem that would blossom into the tax dispute now before us. Whereas Mickey, Edward, and Sumner were each registered owners of 33.33% of NAI's stock, the values of their contributions to NAI were disproportionate to their shareholdings, as follows:

| Item | Mickey | Sumner | Edward | Total |
|------|--------|--------|--------|-------|
| Cash contributed | $3,000 | -0- | -0- | $3,000 |
| Property contributed | $30,328 | $18,445 | $17,845 | $66,618 |
| Total | $33,328 | $18,445 | $17,845 | $69,618 |
| Percentage | 47.88% | 26.49% | 25.63% | 100% |

Mickey gave Sumner, his elder son, the more public and glamorous job of working with movie studios and acquiring new theaters. Edward had principal responsibility for operational and back-office functions. His duties included maintaining existing properties and developing new properties.

*The 1968 Redemption*

As he approached age 70, Mickey developed a plan to retire gradually from active involvement in NAI's operations. To implement this plan, he decided to transfer a portion of his common stock to his grandchildren and to exchange the balance of his shares for preferred stock.

On May 6, 1968, Mickey as settlor executed an agreement of trust for the benefit of his four grandchildren (Grandchildren's Trust). The three trustees were Belle, Edward, and Sumner. That same day Mickey transferred 50 shares of NAI common stock to the Grandchildren's Trust. He filed a timely Federal gift tax return valuing these shares at $564,075 and paying gift tax accordingly. Belle likewise filed a Federal gift tax return, consenting to have Mickey's gift treated as having been made one-half by her.

Mickey then exchanged his remaining 50 shares of NAI common stock for preferred stock. In December 1968 NAI's charter was amended to provide for a class of preferred stock, and in March 1969 Mickey's 50 shares of common stock were redeemed in exchange for 86,780 shares of NAI preferred stock. Thus, as of March 31, 1969, NAI had outstanding 250 shares of voting common stock that were owned by Sumner (100 shares), Edward (100 shares), and the Grandchildren's Trust (50 shares).

*1971 Dispute*

Toward the end of the 1960s the first of many conflicts developed within the Redstone family. Edward's son Michael began to manifest serious psychiatric problems. After strug-

gling with these problems for several years, Edward and Leila decided that they had no alternative but to have their son admitted as a resident psychiatric patient at McLean Hospital in Boston. Mickey, Belle, and Sumner strongly disagreed with this course of action, in part because they feared it reflected badly on the Redstone family name. Mickey and Sumner insisted that Edward remove Michael from the facility and restore him to the family. Edward eventually acquiesced, but he greatly resented this intrusion into his and Leila's personal lives. For his part, Mickey began to doubt whether Edward had Michael's best interests at heart.

About this time Edward began to feel marginalized, not only within his extended family, but also within the family business. He became dissatisfied with his role at NAI, with certain business decisions that Mickey and Sumner had made, and with what he regarded as a lack of respect for his views. He began to discuss, in general terms, the possibility that he might leave the family business. This possibility became more concrete when Sumner, without first discussing the matter with Edward, hired Jerry Swedrow to take over Edward's responsibilities for NAI operations. When Edward learned of this he became incensed. In June 1971 he abruptly quit the family business.

Upon leaving, Edward demanded but did not receive possession of the 100 shares of common stock registered in his name. To help secure possession of these shares, Edward hired attorney James R. DeGiacomo. Edward took the position that he was legally entitled to, and had an unrestricted right to sell, the shares registered in his name. He threatened to sell the shares to an outsider if NAI did not redeem them at an appropriate price.

Edward's threat to sell his shares to an outsider was anathema to Mickey and Sumner because they wished to keep control of the Redstone business within the family. Mickey refused to give Edward his stock certificates, contending that NAI had a right of first refusal to repurchase the shares. Mickey and his attorneys also developed an argument that a portion of Edward's stock, though registered in his name, had actually been held since NAI's inception in an "oral trust" for the benefit of Edward's children. This argument built on the fact that Mickey in 1959 had contributed 48% of NAI's capital yet had received only 33.33% of its

stock. In effect, Mickey contended that he had gratuitously accorded Edward more stock than he was entitled to, and that, to effectuate Mickey's intent in 1959, the "extra" shares should be regarded as being held in trust for Edward's children. Mickey initially insisted that at least half of Edward's shares were covered by this alleged oral trust.

The parties negotiated for six months in search of a resolution. They explored, without success, various options whereby Edward would remain in the business as an employee or consultant. Edward offered to sell his 100 shares back to NAI, and the parties explored various pricing scenarios under which this might occur. As the family patriarch, however, Mickey had most of the leverage, and he insisted that Edward acknowledge the existence of an oral trust for the benefit of Edward's children. Mickey's insistence on an oral trust was a "line in the sand" and a "deal breaker."

Upon reaching an impasse, Edward authorized Mr. DeGiacomo to file in Massachusetts Superior Court two lawsuits against Mickey, Sumner, and the Redstone family companies: *Redstone v. Nat'l Amusements, Inc.*, No. 94575 EQ (NAI Action), and *Redstone v. Northeast Theatre Com.*, No. 94576 EQ (Northeast Action). The NAI action, filed in December 1971, alleged that Edward owned 100 shares of voting common stock, that these shares were "unencumbered and unrestricted as to their transferability," and that the 100 shares should be delivered immediately to Edward. Mickey answered that he had possession of all the stock registered in Edward's name and that a portion of the shares so registered were "held in trust for the benefit of * * * [Edward's] children."

This litigation became quite adversarial, and its public nature was extremely distressing to the Redstone family, especially to Mickey's wife (and Edward's mother) Belle. She implored Edward to reach some accommodation with his father. In the course of negotiations, it became apparent to Mr. DeGiacomo that Edward had to separate completely from NAI and that Mickey would not be placated unless Edward acknowledged the supposed "oral trust" and placed some of the disputed shares in trust for his children, Michael and Ruth Ann.

A settlement was ultimately reached along these lines. Notwithstanding that 100 shares of NAI voting common

stock were registered in Edward's name, the parties agreed that Edward was the owner "free and clear of all trusts, restrictions and encumbrances" of only 66⅔ shares of such stock. They further agreed that the remaining 33⅓ shares of NAI stock registered in Edward's name were then held, and had always been held by Edward, "for the benefit of his children * * * in trust and not as beneficial owner." This settlement was a compromise of the parties' respective positions. It reflected, on the one hand, Mickey's desire to ensure the financial security of Edward's children and, on the other hand, Edward's desire to conclude the litigation by securing payment for at least a portion of his shares.

The parties agreed that NAI would purchase from Edward the 66⅔ shares of stock that he was deemed to own. They further agreed that "Ed's ⅔ stock interest was to be valued at Five Million Dollars for purposes of a settlement agreement" dated June 30, 1972 (Settlement Agreement). Edward executed an assignment transferring to NAI, in exchange for $5 million, 66⅔ shares of NAI voting common stock.

The Settlement Agreement further required Edward to execute irrevocable declarations of trust, likewise dated June 30, 1972, for the benefit of his children. These trusts were styled the Ruth Ann Redstone Trust (Ruth Ann Trust) and the Michael David Redstone Trust (Michael Trust). Sumner was named the sole trustee of each trust. Edward executed two assignments, each transferring 16⅔ shares of NAI stock to Sumner as trustee of the respective Trusts.

Finally, the Settlement Agreement required the parties to execute various releases. All parties executed mutual releases respecting claims concerning Edward's ownership interests in NAI and Northeast. Edward resigned from all positions he had held in the Redstone family businesses and resigned as trustee (or relinquished the right to serve as successor trustee) of all Redstone family trusts. The Settlement Agreement also resolved certain disputes in the Northeast Action that are not relevant here.

On July 19, 1972, the parties filed with the Massachusetts Superior Court a Stipulation in the NAI Action setting forth the terms of this settlement. That same day, the Massachusetts Superior Court issued a Final Decree incorporating the terms of the Settlement Agreement.

*O'Connor Litigation*

Litigation commenced in 2006 sheds further light on the events involved in this case. *See O'Connor v. Redstone*, 896 N.E.2d 595 (Mass. 2008). Michael Redstone and the trustees of certain Redstone family trusts sued Sumner, Edward, and NAI, arguing (among other things) that additional stock should have been transferred to the various Trusts in 1972 based on the purported existence of a prior "oral trust." The "oral trust" issue was the subject of extensive deposition and trial testimony.[3] At the conclusion of trial the Massachusetts Superior Court ruled that the plaintiffs had failed to prove that an oral trust was ever created.

Edward testified during the *O'Connor* trial about the background and resolution of the 1971–1972 dispute. He testified that he firmly believed he was entitled to all 100 shares of NAI stock that were originally registered in his name. However, he ultimately accepted Mr. DeGiacomo's advice that it was in his best interest to compromise and settle the litigation. He explained that he paid no gift tax in 1972 upon transferring the stock to the Michael and Ruth Ann Trusts because he "made no gift." Rather, he stated that he had been forced to renounce his ownership interest in the 33⅓ shares in order to obtain payment for the remaining 66⅔ shares.

Edward testified that Mickey and Sumner had developed the concept of an oral trust as a means of justifying their position. In Edward's view, he had never held any NAI shares under an oral trust for his children, notwithstanding the provision in the Settlement Agreement reciting that 33⅓ of his shares had always been so held. He testified that he had been forced to acknowledge the existence of an oral trust in order to placate his father and settle the litigation. As he stated: "I was forced to do this. * * * I had to accept the writing in order to settle the matter, indicate that there was an oral trust."

---

[3] The trial transcript of the *O'Connor* litigation, and the transcripts of certain depositions taken in that case, are included among the exhibits to the parties' stipulation of facts in the instant case.

*Notice of Deficiency*

Edward did not file a Federal gift tax return for the second quarter of 1972. In his and his accountants' view, the NAI shares that he transferred to the Michael and Ruth Ann Trusts did not constitute a taxable gift. In 2010, apparently as a result of the *O'Connor* litigation, Edward's 1972 transfer of stock came to the attention of the Internal Revenue Service (IRS). On January 11, 2013, after an examination, the IRS issued the estate a notice of deficiency determining a deficiency of $737,625 in Federal gift tax for the calendar quarter ended June 30, 1972. [4] Respondent also determined an addition to tax for fraud of $368,813 under section 6653(b) and (as an alternative to fraud) an addition to tax for negligence of $36,881 under section 6653(a) and an addition to tax of $184,406 under section 6651(a)(1). The estate timely petitioned this Court.

## OPINION

### I. *Burden of Proof*

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111, 115 (1933). The estate does not contend that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

### II. *Application of Gift Tax*

#### A. *Governing Legal Principles*

During 1972 the Federal gift tax was imposed for each calendar quarter "on the transfer of property by gift" during

---

[4] According to respondent's theory—that Edward made a taxable gift and was required to file a return reporting the 1972 transfer—the notice of deficiency was timely. Section 6501(c)(3) provides that, "[i]n the case of failure to file a return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time." The estate does not contend that Edward filed a gift tax return reporting the 1972 transfer or that the period of limitations has expired for any other reason. The estate has thus waived any affirmative defense. *See* Rule 39. In any event, because we rule for the estate on the merits, any issue regarding the period of limitations is moot. *Cf. Estate of Brown v. Commissioner*, T.C. Memo. 2013–50.

that quarter. Sec. 2501(a)(1). "Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift." Sec. 2512(b). A necessary corollary of this provision is that a transfer of property in exchange for "an adequate and full consideration" does not constitute a "gift" for Federal gift tax purposes. *See, e.g.*, *Commissioner v. Wemyss*, 324 U.S. 303 (1945).

The Treasury Regulations confirm that "[t]he gift tax is not applicable to a transfer for a full and adequate consideration in money or money's worth, or to ordinary business transactions." Sec. 25.2511–1(g)(1), Gift Tax Regs. The application of the gift tax depends "on the objective facts of the transfer and the circumstances under which it is made, rather than on the subjective motives of the donor." *Ibid.* Thus, "[d]onative intent on the part of the transferor is not an essential element in the application of the gift tax." *Ibid.*

The regulations define a "transfer of property made in the ordinary course of business" as "a transaction which is bona fide, at arm's length, and free from any donative intent." Sec. 25.2512–8, Gift Tax Regs.; *see Weller v. Commissioner*, 38 T.C. 790, 806 (1962). A transaction meeting this standard "will be considered as made for an adequate and full consideration in money or money's worth." Sec. 25.2512–8, Gift Tax Regs. That is so even if one party to the transaction later concludes that the consideration he received was inadequate. *See Estate of Anderson v. Commissioner*, 8 T.C. 706, 720 (1947) ("Bad bargains * * * are made every day in the business world * * * ; but no one would think for a moment that any gift is involved[.]").

A transfer of property within a family group normally receives close scrutiny. *See, e.g.*, *Frazee v. Commissioner*, 98 T.C. 554, 561 (1992). However, a transfer of property between family members may be treated as one "in the ordinary course of business" if it meets the criteria set forth above. *See Stern v. United States*, 436 F.2d 1327, 1330 (5th Cir. 1971); *Rosenthal v. Commissioner*, 205 F.2d 505, 509 (2d Cir. 1953), *rev'g* 17 T.C. 1047 (1951); *Estate of Anderson*, 8 T.C. at 720. In *Harris v. Commissioner*, 340 U.S. 106, 109 (1950), for example, the Supreme Court found no taxable gift where a divorcing couple "voluntarily unravelled their busi-

ness interests on the basis of * * * [a] compromise." As the Court explained, *id.* at 112:

> This transaction * * * [was] not "in the ordinary course of business" in any conventional sense. Few transactions between husband and wife ever would be * * * . But if two partners on dissolution of the firm entered into a transaction of this character or if chancery did it for them, there would seem to be no doubt that the unscrambling of the business interests would satisfy the spirit of the Regulations. No reason is apparent why husband and wife should be under a heavier handicap * * *.

On numerous occasions, this Court has held that a transfer of property between family members, in settlement of bona fide unliquidated claims, was made for "a full and adequate consideration" because it was a transaction in the "ordinary course of business." For example, in *Beveridge v. Commissioner*, 10 T.C. 915 (1948), *acq.* 1949–1 C.B. 1, the taxpayer had transferred certain property as a gift to her daughter, then unmarried. The daughter later decided to marry a man to whom the taxpayer objected, causing a complete estrangement between the two, and the daughter reluctantly returned the property to the taxpayer. Several years after the marriage, the daughter made demand for the property, alleging that she had returned the property under duress and threatening suit. After lengthy negotiations and upon advice of her attorneys, the taxpayer agreed to, and did, place $120,000 in trust for her daughter, thereby securing from her daughter a release of all claims.

The IRS determined that the $120,000 transfer was a taxable gift because it was made "to secure the release of unproven claims which had no ascertainable value." 10 T.C. at 917–918. We disagreed, finding that the taxpayer had received in exchange for the transfer a "release from unliquidated claims" and that this release had recognizable monetary value, *id.* at 918:

> [T]he settlement to which she agreed on her attorneys' advice was that which they and she regarded as advantageous economically under the circumstances. Perhaps she could have successfully resisted the daughter's threatened suit, but her attorneys were not certain of the outcome of the litigation and so advised her; the value of the property defended was substantial, and by accepting that settlement, she avoided additional legal expense. She acted, in our opinion, as one would act in the settlement of differences with a stranger.

We accordingly ruled in *Beveridge* that the taxpayer's $120,000 transfer to her daughter was not a gift but "was for an adequate and full consideration in money or money's worth." 10 T.C. at 917–918. We have ruled similarly in other cases involving arm's-length transfers of property in settlement of genuine disputes between family members. *See, e.g.*, *Estate of Friedman v. Commissioner*, 40 T.C. 714 (1963); *Estate of Natkanski v. Commissioner*, T.C. Memo. 1992–380, 64 T.C.M. (CCH) 55; *Estate of Noland v. Commissioner*, T.C. Memo. 1984–209, 47 T.C.M. (CCH) 1640; *Lampert v. Commissioner*, T.C. Memo. 1956–226, 15 T.C.M. (CCH) 1184; *Chase Nat'l Bank v. Commissioner*, 12 T.C.M. (CCH) 455 (1953).

B. *Analysis*

A transfer of property will be regarded as occurring "in the ordinary course of business" and thus will be considered to have been made "for an adequate and full consideration in money or money's worth" only if it satisfies the three elements specified in section 25.2512–8, Gift Tax Regs. To meet this standard, the transfer must have been bona fide, transacted at arm's length, and free of donative intent. In applying this regulation to settlements of family disputes, we have identified certain subsidiary factors that may also be relevant. We have considered, for example: whether a genuine controversy existed between the parties; whether the parties were represented by and acted upon the advice of counsel; whether the parties engaged in adversarial negotiations; whether the value of the property involved was substantial; whether the settlement was motivated by the parties' desire to avoid the uncertainty and expense of litigation; and whether the settlement was finalized under judicial supervision and incorporated in a judicial decree. *See, e.g.*, *Estate of Natkanski*, 64 T.C.M. (CCH) at 59; *Estate of Noland*, 47 T.C.M. (CCH) at 1644–1645.

1. *Bona Fide*

The requirement that the transfer be "bona fide" considers whether the parties were settling a genuine dispute as opposed to engaging in a collusive attempt to make the transaction appear to be something it was not. *See* Black's Law Dictionary 199 (9th ed. 2009) (defining "bona fide" as

"[m]ade in good faith; without fraud or deceit"). There is no indication that the 1971–1972 dispute within the Redstone family was a sham designed to disguise a gratuitous transfer to Edward's children. All the evidence points in the opposite direction.

Edward was not working in concert with Mickey or Sumner in any sense of the word. To the contrary, Edward was genuinely estranged from his father and his brother during 1971–1972, and this estrangement grew worse as time went on. On both the business and family fronts, Edward had legitimate grievances against Mickey and Sumner, and they had (or thought they had) legitimate grievances against him.

Edward's agreement to release his claim to 33⅓ shares of NAI stock represented a bona fide settlement of this dispute. Although Edward had a reasonable claim to all 100 shares registered in his name, Mickey had possession of these shares and refused to disgorge them, forcing Edward to commence litigation. The "oral trust" theory on which Mickey relied was evidently a theory in which he passionately believed. And it had some link to historical fact: at NAI's inception, Edward was listed as a registered owner of 33.33% of NAI's shares even though he had contributed only 25.6% of its assets.

The Massachusetts courts, 37 years later, ultimately found insufficient evidence that an oral trust was ever created. But this theory had sufficient plausibility to generate a great deal of litigation over the course of many years. *See Lampert*, 15 T.C.M. (CCH) at 1189 (finding that settlement was not a gift where "the various claims of petitioner's children were not * * * so 'extremely tenuous in nature' that the agreement * * * settling such claims was without adequate consideration"). Edward testified during the *O'Connor* trial that he had been forced to acknowledge the existence of an oral trust, and to relinquish his claim to 33⅓ shares, in order to placate his father and receive payment for the remaining 66⅔ shares. This testimony comports with the evidence at trial and convinces us that Edward's transfer of stock in trust for his children represented the bona fide settlement of a genuine dispute.

2. *Arm's Length*

The requirement that the transfer be "arm's length" is satisfied so long as the taxpayer acts "as one would act in the settlement of differences with a stranger." *Beveridge*, 10 T.C. at 918. Edward was genuinely estranged from Mickey and Sumner in 1972. The evidence establishes that they settled their differences as such.

Edward hired a lawyer, Mr. DeGiacomo, who testified convincingly at trial. He commenced two lawsuits against Mickey, Sumner, and NAI. The lawyers for all parties negotiated for many months as genuine adversaries in search of a compromise. They eventually reached a settlement that Edward accepted on his lawyer's advice; both evidently regarded this compromise "as 'advantageous economically.'" *Estate of Friedman*, 40 T.C. at 720 (quoting *Beveridge*, 10 T.C. at 918). "The presence of counsel at the conference table for the purpose of advising and representing the respective parties as to their rights and obligations, together with other relevant facts and circumstances, dispels any rational theory that a payment made in connection with such settlement was intended for or could have been a gift." *Lasker v. Commissioner*, 138 F.2d 989, 991 (7th Cir. 1943).

All the elements of arm's-length bargaining existed here. There was a genuine controversy among Edward, Mickey, and Sumner; they were represented by and acted upon the advice of counsel; they engaged in adversarial negotiations for a protracted period; the compromise they reached was motivated by their desire to avoid the uncertainty and embarrassment of public litigation; and their settlement was incorporated in a judicial decree that terminated the lawsuits. Because Edward acted "as one would act in the settlement of differences with a stranger," his transfer of shares in trust for his children was an arm's-length transaction. *See Beveridge*, 10 T.C. at 918; *Estate of Natkanski*, 64 T.C.M. (CCH) at 59; *Estate of Noland*, 47 T.C.M. (CCH) at 1644–1645; *Lampert*, 15 T.C.M. (CCH) at 1189–1190.

3. *Absence of Donative Intent*

Although donative intent is not prerequisite to a "gift," *Commissioner v. Wemyss*, 324 U.S. at 306, the absence of donative intent is essential for a transfer to be treated as

made "in the ordinary course of business," sec. 25.2512–8, Gift Tax Regs.; *see Weller*, 38 T.C. at 806. Generally, donative intent will be found lacking when a transfer is "not actuated by love and affection or other motives which normally prompt the making of a gift." *Beveridge*, 10 T.C. at 918; *see Estate of Noland*, 47 T.C.M. (CCH) at 1644–1645.

Edward transferred 33⅓ NAI shares in trust for his children, Michael and Ruth Ann. Although his relations with Michael may have been strained at this time, we assume that both children remained objects of his affection. A transfer of stock to one's children, however, is not necessarily imbued with donative intent. The transferees in most of the cases discussed above were the transferor's children, but these transfers were nevertheless held to have been made "in the ordinary course of business."

Edward's objective throughout the 1971–1972 dispute was to obtain for himself ownership of (or full payment for) the 100 NAI shares originally registered in his name. Mickey floated in late 1971 the concept that Edward had held a portion of these shares since 1959 in trust for his children. If Edward had been motivated by donative intent toward his children, he could have embraced Mickey's concept at once and resolved the dispute without the expense and family disharmony generated by filing two lawsuits. Edward filed these lawsuits because he refused to embrace the "oral trust" theory and wished to obtain possession, in his own name, of all 100 shares.[5]

The evidence clearly established that Edward transferred stock to his children, not because he wished to do it, but because Mickey demanded that he do it. Mickey disagreed with how Edward was raising his children, especially Michael, whom Edward had institutionalized against Mickey's wishes. The transfer of stock in trust for Michael and Ruth Ann was prompted by Mickey's twin desires to ensure his grandchildren's financial security and to keep the Redstone family business within the Redstone family. At the time of the settlement, Edward had no desire to transfer

---

[5] Both economic and family reasons may have motivated Edward to insist on securing outright ownership of (or payment for) all 100 shares. Having abruptly quit the family business, he was likely concerned about his own financial security. And he may have been reluctant to transfer wealth to his son, whom he had recently placed in a mental hospital.

stock to his children. He was forced to accept this transfer in order to placate Mickey, settle the family dispute, and obtain a $5 million payment for the remaining 66⅔ shares.

We find that Edward acquiesced in the notion of an "oral trust" because he had no other alternative; this was a "deal breaker" for Mickey. There is no evidence that Edward, in making this transfer, was motivated by love and affection or other feelings that normally prompt the making of a gift. Because Edward's transfer of stock to his children represented the settlement of a bona fide dispute, was made at arm's length, and was "free from any donative intent," it meets the three criteria for a transaction "in the ordinary course of business" specified in section 25.2512–8, Gift Tax Regs.

### 4. *Source of the "Consideration"*

Respondent does not seriously challenge any of the conclusions set forth above. Instead, he emphasizes that Ruth Ann and Michael were not parties to the litigation or settlement of the dispute. As a result, they did not provide (and could not have provided) any consideration to Edward for the transfer of the shares. Because no consideration flowed from the transferees, respondent contends that Edward's transfer was necessarily a "gift."

Respondent's argument derives no support from the text of the governing regulations. Section 25.2511–1(g)(1), Gift Tax Regs., provides unequivocally that "[t]he gift tax is not applicable to a transfer for a full and adequate consideration in money or money's worth." Section 25.2512–8, Gift Tax Regs., provides that a "transfer of property made in the ordinary course of business * * * will be considered as made for an adequate and full consideration in money or money's worth." Section 25.2512–8, Gift Tax Regs., specifies three elements that an ordinary business transaction must meet, and we have found that Edward's transfer met all three elements. The consequence of that determination is that "[t]he gift tax is not applicable to * * * [the] transfer." Sec. 25.2511–1(g)(1), Gift Tax Regs.

Respondent's argument focuses on whether the transferees *provided* consideration. But that is not the question the regulation asks. It asks whether the transferor *received* consideration, that is, whether he made the transfer "*for* a full and

adequate consideration" in money or money's worth. Sec. 25.2511–1(g)(1), Gift Tax Regs. (emphasis added). We have determined that Edward received "a full and adequate consideration" for his transfer—namely, the recognition by Mickey and Sumner that Edward was the outright owner of 66⅔ NAI shares and NAI's agreement to pay Edward $5 million in exchange for those shares. Section 2512(b) and its implementing regulations require that the donor receive "an adequate and full consideration"; they make no reference to the source of that consideration.

The parties have not brought to our attention, and our research has not discovered, any Tax Court precedent addressing the "source of consideration" question that respondent presents for decision. However, the result we reach accords with that reached by the U.S. District Court in *Shelton v. Lockhart*, 154 F. Supp. 244 (W.D. Mo. 1957). The taxpayer there, an Osage Indian, applied for a certificate of competency from the Bureau of Indian Affairs (BIA). This certificate would have afforded her (among other things) the unrestricted right to own and dispose of $600,000 in property that the BIA held on her behalf. In her application she stated that she would make a portion of this property available to her children when they reached the age of 18.

Fearing that the property might be dissipated before then, the BIA replied that it would issue her a certificate of competency only if she first placed in trust irrevocably for her children $300,000 of the property that the BIA held. She rejected that demand, and counsel for the parties commenced negotiations. Ultimately, the taxpayer agreed to place $200,000 of the disputed property into a trust for her children. The BIA then issued her a certificate of competency affording her unrestricted rights to the rest of the property, then worth $412,857.

The IRS contended that the taxpayer's transfer in trust for her children was a taxable gift. The District Court disagreed, ruling that the transfer qualified as a transaction in the "ordinary course of business" under section 25.2512–8, Gift Tax Regs. The court found it irrelevant that the taxpayer's children were not parties to the dispute or its settlement:

> In essence, this transaction simply represents a business venture between Mrs. Shelton and the * * * [BIA]. It was the result of negotiations extending over a period of many months. The fact that in her

original application she indicated that one of the purposes of the application was to be in position to make adequate trust provisions for her children after they reached majority does not in any way negative the unalterable conclusion that the result here—a trust she did not want, made at a time she did not want to make it, and for an amount she was unwilling to pay at the time—was the completion of a cold business bargain, as bona fide as any business bargain could be, negotiated at arm's length, and obviously free from any donative intent. * * * [*Shelton*, 154 F. Supp. at 248.]

Concluding that the transfer satisfied all three elements requisite to the "ordinary course of business" exception, the court held that the transfer was not subject to the Federal gift tax. *Ibid.*

The facts of *Shelton* are remarkably similar to those here. In both cases the assets in dispute were held by a third party. Edward, like Mrs. Shelton, initially demanded 100% of the disputed assets; when the party in actual possession of those assets demurred, lengthy negotiations ensued in which both sides were represented by counsel. Eventually a compromise was reached whereby the taxpayer obtained unrestricted ownership rights over ⅔ of the assets in exchange for transferring ⅓ of the assets in trust for the children. In both cases the consideration received by the taxpayer flowed, not from the transferee children, but from the third party who had possession of the disputed assets. The District Court in *Shelton* found the source of the consideration irrelevant and concluded that the taxpayer's transfer resulted from a "cold business bargain." We reach the same conclusion here. [6]

---

[6] Respondent contends that the children in *Shelton* provided "consideration" because they assertedly gave up claims to a greater percentage of the disputed assets. But Mrs. Shelton's children did not and could not relinquish anything because they were not parties to the dispute or its settlement. The BIA was negotiating on their behalf, just as Mickey was negotiating on behalf of Michael and Ruth Ann. In both cases, the party negotiating on the children's behalf was in possession of the disputed property; the dispute was settled by the taxpayer's transferring a portion of the disputed property to the children in consideration of receiving the balance of the disputed property in his or her own right. In *Shelton*, the BIA was the sole source of the "consideration" received by Mrs. Shelton, just as Mickey and Sumner were the source of the consideration received by Edward. In neither case is it material that no consideration was furnished directly by the transferees.

C. *Conclusion*

We conclude that Edward's transfer of 33⅓ shares of NAI stock to the Michael and Ruth Ann Trusts constituted a bona fide, arm's-length transaction that was free from donative intent and was thus "made in the ordinary course of business." *See* sec. 25.2512–8, Gift Tax Regs. We find that Edward made this transfer "for a full and adequate consideration in money or money's worth," namely, the recognition by Mickey and Sumner that Edward was the outright owner of 66⅔ NAI shares and NAI's payment of $5 million in exchange for those shares. Because "[t]he gift tax is not applicable to a transfer for a full and adequate consideration in money or money's worth, or to ordinary business transactions," sec. 25.2511–1(g)(1), Gift Tax Regs., we find no deficiency in Federal gift tax for the period at issue. And because we have ruled for the estate on the gift tax issue, it is not liable for any addition to tax.

To reflect the foregoing,

*Decision will be entered for petitioner.*