T.C. Memo. 2015-237

UNITED STATES TAX COURT

SUMNER REDSTONE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8097-13. Filed December 9, 2015.

<u>David R. Andelman</u>, <u>Juliette M. Galicia</u>, <u>Lawrence Michael Hill</u>, and <u>Richard A. Nessler</u>, for petitioner.

<u>Carina J. Campobasso</u> and <u>Janet F. Appel</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, <u>Judge</u>: The Internal Revenue Service (IRS or respondent) determined against petitioner a gift tax deficiency of $737,625 for the calendar quarter ending September 30, 1972. Respondent also determined an addition to tax of $368,813 under section 6653(b) for fraud and (alternatively) an addition to tax of

**[*2]** $36,881 under section 6653(a) for negligence and an addition to tax of $184,406 under section 6651(a)(1) for failure to file a timely gift tax return.[1] The focus of the parties' dispute is whether petitioner's 1972 transfer of stock to his children was a "gift" for Federal gift tax purposes or was (as petitioner contends) a transfer for an "adequate and full consideration in money or money's worth." See sec. 2512(b). We find that this transfer was a taxable gift and determine its value on the transfer date. We conclude that petitioner is not liable for any additions to tax.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated by this reference. When he petitioned this Court, Sumner Redstone (Sumner or petitioner) resided in California.

Family and Business Background

Michael "Mickey" Redstone was born on April 11, 1902. He married Belle Redstone, and the couple had two children, Sumner and Edward. Sumner graduated from Harvard College in 1944 and Harvard Law School in 1947. He practiced

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect for the tax period in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar. During 1972, the tax period in issue, what are now "penalties" for fraud and negligence were denominated "additions to tax."

**[\*3]** law for several years, including a stint in the Tax Division of the U.S. Department of Justice, before starting work in 1954 for the family business. Sumner married Phyllis, and they had two children, Brent and Shari. Edward attended college and business school before joining the family business in 1952. He married Leila, and they likewise had two children, Michael and Ruth Ann.[2]

Mickey entered the drive-in movie theater business in 1936. Between 1936 and 1954, Mickey bought real estate throughout the Northeast and built numerous drive-in theaters. He incorporated Northeast Theatre Corporation (Northeast) in 1954, and it became the management company for the Redstone family business. For each drive-in theater, Mickey typically incorporated three separate entities: one to own the real estate, one to operate the theater, and one to manage refreshments. Mickey, Edward, and Sumner eventually came to own various percentages of these various corporations, with Mickey's aggregate share being the largest.

As the family business grew, this complex corporate structure made it cumbersome to obtain financing. To solve this problem and to consolidate the interests of Mickey, Edward, and Sumner in a single entity, National Amusements, Inc.

---

[2]Edward died in 2011, and his estate is the petitioner in Estate of Redstone v. Commissioner, 145 T.C. __ (Oct. 26, 2015). While that case and the instant case share a common factual background, they present different issues and the resolution of these issues depends to some degree on different evidence.

**[*4]** (NAI) was incorporated as a holding company on August 28, 1959. Its articles of incorporation named Mickey, Edward, and Sumner as the original directors; Mickey was elected president, Sumner vice president, and Edward secretary-treasurer. At the time of trial, NAI was a closely held corporation headquartered in Norwood, Massachusetts.

Upon NAI's incorporation, Mickey, Edward, and Sumner each contributed to it their stock in the pre-existing movie companies. The book value of the stock that each contributed was $30,328, $17,845, and $18,445, respectively. Mickey also contributed $3,000 in cash. According to the minutes of the first meeting of directors dated September 1, 1959, a total of 300 shares of class A voting common stock were to be issued: 100 shares each to Mickey, Edward, and Sumner. It was Mickey's decision to divide the shares evenly. Consistently with these decisions, the stock certificates indicated that Mickey, Edward, and Sumner were each registered owners of 100 unrestricted shares of NAI common stock. All of the physical stock certificates were retained in NAI's corporate office.

The decisions taken at NAI's organizational meeting contained the seeds of the problem that would blossom into the tax dispute now before us. Whereas Mickey, Edward, and Sumner were each registered owners of 33.33% of NAI's

[*5] stock, the values of their contributions to NAI were disproportionate to their shareholdings, as follows:

| Item | Mickey | Sumner | Edward | Total |
|------|--------|--------|--------|-------|
| Cash contributed | $3,000 | -0- | -0- | $3,000 |
| Property contributed | 30,328 | $18,445 | $17,845 | 66,618 |
| Total | 33,328 | 18,445 | 17,845 | 69,618 |
| Percentage | 47.88% | 26.49% | 25.63% | 100% |

The 1968 Redemption

As he approached age 70, Mickey developed a plan to retire gradually from active involvement in NAI's operations. To implement this plan, he decided to transfer a portion of his common stock to his grandchildren and to exchange the balance of his shares for preferred stock.

On May 6, 1968, Mickey as settlor executed an agreement of trust for the benefit of his four grandchildren (Grandchildren's Trust). The three trustees were Belle, Edward, and Sumner. That same day, Mickey transferred 50 shares of NAI common stock to the Grandchildren's Trust. His accountants at J.K. Lasser & Company (J.K. Lasser) prepared and filed on his behalf a timely Federal gift tax return valuing these shares at $564,075, and Mickey paid the resulting gift tax due.

**[*6]** Belle likewise filed a Federal gift tax return consenting to have Mickey's gift treated as having been made one-half by her.

Mickey then exchanged his remaining 50 shares of NAI common stock for preferred stock. In December 1968 NAI's charter was amended to provide for a class of preferred stock, and in March 1969 Mickey's 50 shares of common stock were redeemed in exchange for 86,780 shares of NAI preferred stock. Thus, as of March 31, 1969, NAI had outstanding 250 shares of voting common stock that were owned by Sumner (100 shares), Edward (100 shares), and the Grand-children's Trust (50 shares).

## 1971 Dispute

As time went on Edward became increasingly dissatisfied with his role at NAI and with certain decisions that Mickey and Sumner had made. Also during this period, one of Edward's children was experiencing serious problems that were a source of frustration and distraction to him. For a variety of reasons, he decided in June 1971 to terminate his employment with NAI.

Upon leaving, Edward demanded but did not receive possession of the 100 shares of common stock registered in his name. To help secure possession of these shares, Edward hired attorney James R. DeGiacomo. Edward took the position that he was legally entitled to, and had an unrestricted right to sell, the shares

**[*7]** registered in his name. He threatened to sell the shares to an outsider if NAI did not redeem them at an appropriate price.

Edward's threat to sell his shares to an outsider was anathema to Mickey and Sumner because they wished to keep control of the Redstone businesses within the family. Mickey refused to give Edward his stock certificates, contending that NAI had a right of first refusal to repurchase the shares. Mickey and his attorneys also developed an argument that a portion of Edward's stock, though registered in his name, had actually been held since NAI's inception in an "oral trust" for the benefit of Edward's children. This argument built on the fact that Mickey in 1959 had contributed 48% of NAI's capital yet had received only 33.33% of its stock. In effect, Mickey contended that he had gratuitously accorded Edward more stock than he was entitled to, and that, to effectuate Mickey's intent in 1959, the "extra" shares should be regarded as being held in trust for Edward's children. Mickey took the position that at least half of Edward's shares were covered by this alleged oral trust.

The parties negotiated for six months in search of a resolution. They explored, without success, various options whereby Edward would remain in the business as an employee or consultant. Edward offered to sell his 100 shares back to NAI, and the parties explored various pricing scenarios under which this might

[*8] occur. As the family patriarch, however, Mickey had most of the leverage, and he insisted that Edward acknowledge the existence of an oral trust for the benefit of Edward's two children. Mickey's insistence on an oral trust was a "line in the sand" and a "deal breaker."

Upon reaching an impasse, Edward authorized Mr. DeGiacomo to file in Massachusetts Superior Court two lawsuits against Mickey, Sumner, and the Redstone family companies: Redstone v. Nat'l Amusements, Inc., No. 94575 EQ (NAI Action), and Redstone v. Northeast Theatre Com., No. 94576 EQ (Northeast Action). The NAI Action, filed in December 1971, alleged that Edward owned 100 shares of voting common stock, that these shares were "unencumbered and unrestricted as to their transferability," and that the 100 shares should be delivered immediately to Edward. Mickey answered that he had possession of all the stock registered in Edward's name and that a portion of the shares so registered were "held in trust for the benefit of * * * [Edward's] children."

This litigation became quite adversarial, and its public nature was extremely distressing to the Redstone family, especially Mickey's wife, Belle. She implored Edward to reach some accommodation with his father. In the course of negotiations, it became apparent to Mr. DeGiacomo that Edward had to separate com-

**[*9]** pletely from NAI and that Mickey would not be satisfied unless some of Edward's disputed shares were placed in trust for his children, Michael and Ruth Ann.

A settlement was ultimately reached along these lines. Notwithstanding that 100 shares of NAI voting common stock were registered in Edward's name, the parties agreed that Edward was the owner "free and clear of all trusts, restrictions and encumbrances" of only 66 2/3 shares of such stock. They further agreed that the remaining 33 1/3 shares of NAI stock registered in Edward's name were then held, and had always been held by Edward, "for the benefit of his children * * * in trust and not as beneficial owner." This settlement was a compromise of the parties' respective positions. It reflected, on the one hand, Mickey's desire to ensure the financial security of Edward's children and, on the other hand, Edward's desire to conclude the litigation by securing payment for at least some of his shares.

The settlement agreement dated June 30, 1972 (Settlement Agreement) provided that NAI would repurchase the 66 2/3 shares of stock that Edward was deemed to own. The parties agreed that Edward's 66 2/3 shares were to be valued at $5 million and that a redemption agreement would be executed simultaneously. Edward and NAI executed the Redemption Agreement, which provided that the $5 million purchase price would be paid as 44 quarterly installments of $125,000

[*10] (including principal and interest), plus a final payment of all principal and interest then remaining due. NAI executed an installment note that bore interest at the "floating prime rate" charged by the Boston bank from which NAI had obtained most of its financing. In exchange for this stream of payments, Edward executed an assignment transferring 66 2/3 shares of voting common stock to NAI.

The Settlement Agreement required Edward to execute irrevocable declarations of trust, likewise dated June 30, 1972, for the benefit of his children. These trusts were styled the Ruth Ann Redstone Trust (Ruth Ann Trust) and the Michael David Redstone Trust (Michael Trust). Sumner was named the sole trustee of each trust. Edward executed two assignments, each transferring 16 2/3 shares of NAI stock to Sumner as trustee of the respective trusts.

Finally, the Settlement Agreement required the parties to execute various releases. All parties executed mutual releases respecting claims concerning Edward's ownership interests in NAI and Northeast. Edward resigned from all positions he had held in the Redstone family businesses and resigned as trustee (or relinquished the right to serve as successor trustee) of all Redstone family trusts. The Settlement Agreement also resolved certain disputes in the Northeast Action that are not relevant here.

[*11] On July 19, 1972, the parties filed with the Massachusetts Superior Court a Stipulation in the NAI Action setting forth the terms of this settlement. That same day, the Massachusetts Superior Court issued a Final Decree incorporating the terms of the Settlement Agreement as set forth in the Stipulation.

Sumner's Transfer of Stock to Trusts for His Children

On July 21, 1972, three weeks after the Settlement Agreement was signed, Sumner executed irrevocable declarations of trust for the benefit of his two children. These trusts were styled the Brent Dale Redstone Trust (Brent Trust) and the Shari Ellin Redstone Trust (Shari Trust). Sumner was named the sole trustee of each trust. That same day, 16 2/3 of the NAI shares originally registered in Sumner's name were re-issued to the Brent Trust; 16 2/3 shares were re-issued to the Shari Trust; and the remaining 66 2/3 shares were re-issued to Sumner. Neither Sumner nor his wife filed a gift tax return for the calendar quarter ending September 30, 1972.

Sumner's transfers of NAI stock to the Brent and Shari Trusts were voluntary. Each transfer was motivated by donative intent toward the natural objects of Sumner's affection. By creating these trusts and transferring 33 1/3 shares of NAI stock to them, Sumner made a gesture of goodwill toward his father, who desired to ensure the financial security of his four grandchildren on equal terms. However,

**[*12]** Sumner was not required to take these actions by the Settlement Agreement that resolved Edward's lawsuits. The only obligation that the Settlement Agreement imposed on Sumner was the requirement that he execute certain releases in consideration of mutual releases executed by the other contracting parties.

The Brent and Shari Trusts, like the Ruth Ann and Michael Trusts, recite that the stock transferred to them had been held "under an oral trust" since 1959. Petitioner presented no evidence that any "oral trust" actually existed whereby Edward or Sumner held in trust for his children a portion of the NAI shares initially registered in his name. Rather, the concept of an "oral trust" developed later and was agreed upon as a mechanism for settling Edward's litigation and implementing Mickey's desire to ensure the financial security of Edward's children.

1984 Redemption

On March 8, 1984, NAI redeemed the 83 1/3 shares held collectively by the Grandchildren's Trust (50 shares), the Ruth Ann Trust (16 2/3 shares), and the Michael Trust (16 2/3 shares). The aggregate redemption price was $21,428,571, or approximately $257,143 per share. Following this redemption, NAI had outstanding only 100 shares of voting common stock. These shares were owned by

**[\*13]** Sumner individually (66 2/3 shares) and by the two Trusts for his children (33 1/3 shares), of which he was the sole trustee.

The O'Connor Litigation

Litigation commenced in 2006 sheds further light on the events involved in this case. See O'Connor v. Redstone, 896 N.E.2d 595 (Mass. 2008). Michael Redstone and the trustees of certain Redstone family trusts sued Sumner, Edward, and NAI, advancing two major contentions. First, they alleged that Sumner in 1984 had improperly caused NAI to redeem, for less than fair market value, the shares held by the Ruth Ann Trust, the Michael Trust, and the Grandchildren's Trust. The Massachusetts Supreme Court eventually held that this claim was time barred. See id. at 616. Second, the plaintiffs alleged that, in 1972, additional stock should have been transferred to the various Trusts based on the purported existence of a prior "oral trust." The "oral trust" issue was the subject of extensive deposition and trial testimony.[3] The trial court concluded that the plaintiffs had failed to prove that an oral trust was ever created. O'Connor v. Redstone, No. 2006-4606 (Mass. Sup. Ct. Nov. 25, 2009).

---

[3]The trial transcript of the O'Connor litigation and the transcripts of certain depositions are included among the exhibits to the parties' stipulation of facts in the instant case.

**[*14]** In deposition and at trial of the O'Connor case, Sumner testified that he had transferred the 33 1/3 shares of NAI stock to the Brent and Shari Trusts voluntarily. At his deposition, he explained that he "voluntarily went through the same procedure" as his brother and "gave * * * [his] own children" the stock. While it was Mickey's position "that at least 50 percent" of Edward's shares were held for Edward's children, Sumner testified that Mickey had never expressed the same reservation regarding Sumner's own shares. He continued: "I voluntarily set up an arrangement--call it what you will--where my own children would get a third of the stock. * * * I wanted to do the same thing that my brother did, only he did it as a result of litigation. I did it voluntarily."

At trial in the O'Connor case Sumner maintained the same position: "Nobody sued me. I gave my kids a third of the stock voluntarily, not as the result of a lawsuit. In [s]o doing, I did what I wanted and appeased my father too." He testified that "[t]here was a big difference between Eddie's position and mine" because Edward "was resisting doing what my father wanted," whereas Sumner was simply trying to maintain good family relations. He later testified to the same effect: "Eddie was sued. I was not. And Eddie had to find a justification for what he was doing in transferring. I wasn't sued. I just made an outright gift."

**[*15]** <u>Contemporaneous Tax Advice</u>

During the 1960s Samuel Rosen was a partner at J.K. Lasser, and Peter Isenberg was a certified public accountant there. (J.K. Lasser subsequently merged with Touche Ross & Co., now Deloitte.) After the 1972 transaction, Messrs. Rosen and Isenberg formed their own firm (Rosen PC) through which Mr. Rosen served as the Redstone family accountant. He worked for Sumner and NAI before the 1972 transactions and continued to do so for many years afterwards. Mr. Isenberg described Mr. Rosen, who was deceased at the time of trial, as a knowledgeable and careful professional who always endeavored to get the right answer.

Sumner sought and received advice from Mr. Rosen about the tax consequences of his transfer of stock to the Brent and Shari Trusts. Mr. Isenberg credibly testified: (1) that Mr. Rosen had obtained advice from J.K. Lasser's national office about this transaction; (2) that this advice was memorialized in a letter or memorandum which concluded that Sumner was not required to file a gift tax return because he had made no taxable gift; and (3) that Mr. Rosen, who was thoroughly familiar with the 1971 litigation and its aftermath, expressed his agreement with J.K. Lasser's conclusion.[4] Mr. Isenberg personally handled petitioner's

---

[4]Mr. Isenberg was unable to locate a copy of the advice document from J.K. Lasser's national office. The Court found this unsurprising because that document

(continued...)

**[\*16]** income and gift tax filings. He credibly testified that if J.K. Lasser had believed a gift tax return was due for the quarter ending September 30, 1972, a return would have been filed.

The tax consequences of Sumner's 1972 transfer were likewise addressed during the O'Connor litigation. Mr. DeGiacomo testified in deposition that J.K. Lasser provided a tax opinion for the transaction. Sumner testified that Mr. Rosen "would have made the determination" whether a gift tax return was required to be filed. "If there were a gift tax due and gift tax return, it would have been filed. If there was a gift tax * * * due, it would have been paid." Consistently with that previous testimony, Sumner testified in the instant case that he had relied on his accountants and lawyers to determine whether gift tax had to be paid in 1972 and "[t]hey apparently concluded that there was no tax due."

Sumner has filed 34 Federal gift tax returns during the course of his life. He filed the first such return in 1970; the next two in 1980; and 32 additional returns for various periods between 1982 and 2012, all reporting taxable gifts. On the basis of the advice he received from Mr. Rosen and J.K. Lasser, however, Sumner did not file a Federal gift tax return for the quarter ending September 30, 1972.

---

[4](...continued)
would have been drafted 43 years ago. Mr. Isenberg credibly testified that he recalled seeing this document contemporaneously with the events in question.

**[*17]** IRS Scrutiny of Petitioner

During 1974, in the wake of the Watergate investigation, the IRS initiated what was called the Political Campaign Contribution Compliance Project (Compliance Project). A Senate Select Committee on Presidential Campaign Activities had expressed concern that some donors might be evading the law by making donations, in amounts smaller than the $3,000 annual gift tax exclusion, to multiple campaign committees that were nominally separate but in fact supported the same candidate. Congress asked the IRS to investigate these concerns. The Compliance Project sought to determine whether transfers of this type involved taxable "gifts" for Federal gift tax purposes.

The Senate Select Committee provided the IRS with lists of contributions that were to be reviewed. Sumner's name appeared on a list of 12 to 14 contributors in the North Atlantic region who had made political contributions during 1970-1972; this list was assigned to IRS Revenue Agent Corbett for review. Agent Corbett testified that the scope of his review was limited to the political campaign contributions made by these individuals. He was unsure whether he technically had authority, under the scope of the Compliance Project, to investigate other gift tax issues that might have come to his attention.

[*18] In April 1975 Agent Corbett mailed Sumner a letter captioned "Possible 1971 and 1972 Gift Tax Liability." The letter asked Sumner to identify all transfers he had made to political committees during 1970-1972 and to provide copies of canceled checks documenting any such transfers. Sumner promptly provided the requested documentation, including schedules of his transfers to political committees during 1970-1972, copies of all relevant cancelled checks, and copies of promissory notes he had received for two loans executed in 1971. On the basis of this information the IRS concluded that "there was no necessity to solicit a gift tax return for 1972."

In 2010, apparently as a result of the O'Connor litigation, Sumner's 1972 transfer of stock to the Brent and Shari Trusts came to the IRS' attention. It accordingly commenced, in May 2011, a gift tax examination covering petitioner's 1972 calendar year. IRS Revenue Agent Cha was assigned to conduct this examination. The focus of his examination was petitioner's potential gift tax liability related to the 1972 stock transfer. Agent Cha was not aware, when conducting this examination, that the IRS had performed an earlier review of Sumner's 1972 political campaign contributions.

Agent Cha's examination lasted more than a year. On several occasions, he requested documents that the IRS did not possess, and Sumner through his attor-

**[*19]** neys complied with each of these document requests. Sumner did not complain, at any time during the audit, of a potential "second examination" in violation of section 7605(b). He first raised the possibility of a "second examination" in early 2014, nearly a year after the IRS had issued the notice of deficiency. That notice was issued on January 11, 2013, and Sumner timely petitioned this Court on April 10, 2013.

Expert Valuation Testimony

At trial respondent offered, and the Court recognized, Steven C. Hastings as an expert in valuing closely held companies and stock interests in closely held companies. Mr. Hastings relied principally on a "mergers and acquisitions" approach. Employing this method, he valued the 33 1/3 shares of NAI stock that Sumner transferred on July 21, 1972, principally by reference to the price at which NAI had redeemed Edward's 66 2/3 shares three weeks previously.

In Mr. Hastings' opinion, the $5 million redemption price that NAI agreed to pay Edward was negotiated at arm's length, was essentially contemporaneous with Sumner's transfer, and yielded a value of $75,000 per NAI common share. Mr. Hastings opined that NAI's redemption of Edward's shares "was a private transaction for a minority interest" and that the redemption price thus established the per-share value of NAI's common stock "on a minority, non-marketable interest

[*20] basis." Mr. Hastings accordingly concluded that the 33 1/3 shares that Sumner transferred to his children's Trusts in July 1972 were worth $2.5 million (33 1/3 x $75,000).

Mr. Hastings also valued the transferred shares using the "direct capitalization" and "guideline public company" methods. In performing these valuations, Mr. Hastings concluded that a discount for lack of marketability was necessary; he determined the appropriate discount to be 34%. Applying this discount, he determined values for the 33 1/3 shares of $2,433,608 and $2,997,054, respectively.

Petitioner offered, and the Court recognized, Gordon Klein as an expert in the field of business valuations. He determined the value of the transferred shares using the so-called engrafting method. As his starting point for valuing the NAI shares that Sumner transferred in July 1972, Mr. Klein used the per-share price, $257,143, that NAI paid to redeem the Trusts' shares in March 1984. He computed ratios between the 1984 redemption price and (1) NAI's average net income for 1981-1983 and (2) the book value of NAI's common shareholders' equity in 1984. He then "applied these same ratios to comparable NAI data existing at or about the time" of Sumner's transfer. On the basis of these ratios, Mr. Klein concluded that the 33 1/3 shares that Sumner transferred to his children's Trusts in July 1972 were worth $735,981 (33 1/3 x $22,079).

**[*21]**                                   OPINION

I.      Threshold Issues

        A.      Burden of Proof

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving those determinations erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioner does not contend that the burden of proof shifts to respondent under section 7491(a) as to any issue of fact.

        B.      Period of Limitations

Section 6501(c)(3) provides that, "[i]n the case of failure to file a return, the tax may be assessed * * * at any time." Sumner did not file a Federal gift tax return reporting the 1972 transfer of stock to the children's Trusts. The notice of deficiency, though issued 41 years after the transfer, was thus timely. See Estate of Brown v. Commissioner, T.C. Memo. 2013-50, at *8-*9. See generally Estate of Sanders v. Commissioner, T.C. Memo. 2014-100, at *5.

Petitioner moved before trial for judgment on the pleadings. Admitting that the period of limitations on assessment was "technically still open," he contended that respondent was barred by laches from determining in 2013 a gift tax deficiency for the third quarter of 1972. Petitioner noted that he is "now 90 years old; material

[*22] witnesses have been dead for decades; documents have long since been discarded or have disintegrated; memories have unquestionably eroded." Under these circumstances, petitioner described this case as involving "an unprecedented abuse * * * of the rule that no statute of limitations applies."

We denied this motion by order dated December 5, 2013, concluding as follows:

> It is well settled that the United States is not subject to the defense of laches in enforcing its rights. See United States v. Summerlin, 310 U.S. 414, 416 (1940); Guaranty Trust Co. v. United States, 304 U.S. 126 (1938); United States v. Menatos, 925 F.2d 333, 335 (9th Cir. 1991); Wright v. Commissioner, T.C. Memo. 2005-5, 89 T.C.M. (CCH) 662, 666. The inapplicability of the laches doctrine is especially clear where (as here) the Government seeks to enforce tax claims that are governed by an express statute of limitations. In such cases, the "timeliness of Government claims is governed by the statute of limitations enacted by Congress." Fein v. United States, 22 F.3d 631, 634 (5th Cir. 1994). Accord Kohler v. Commissioner, T.C. Memo. 2008-127, 95 T.C.M. (CCH) 1494, 1496-97; Wright v. Commissioner, 89 T.C.M. at 666.

A party asserting laches must establish certain facts. If this equitable defense were available to petitioner, he would need to demonstrate (for example) that the IRS was aware of the 1972 gifts but sat on its rights and that petitioner suffered "undue prejudice" as a result. See, e.g., Fridovich v. Commissioner, T.C. Memo. 2001-32, 81 T.C.M. (CCH) 1143, 1146. Petitioner made no effort to establish such facts at trial. Quite the contrary: the evidence indicated that the IRS did not be-

**[*23]** come aware of the 1972 transfers until 2010, after the O'Connor litigation had ended, and respondent commenced his gift tax examination reasonably promptly thereafter. In any event, petitioner did not advance arguments based on laches or other equitable defenses in his pretrial memorandum or in his post-trial briefs. See Mendes v. Commissioner, 121 T.C. 308, 312-313 (2003) (holding that arguments not addressed in post-trial brief may be considered abandoned).

C.     Second Examination

Section 7605(b) provides that a taxpayer shall not be subjected to "unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary." Congress enacted section 7605(b) to protect taxpayers from harassment by "low-echelon revenue agents * * * by requiring such agents to clear any repetitive examination with a superior." United States v. Powell, 379 U.S. 48, 55-56 (1964). "There is no intimation in the legislative history [of section 7605(b)] that Congress intended the courts to oversee the Commissioner's determinations to investigate." Ibid. The Court of Appeals for the Ninth Circuit, to which an appeal in this case would lie absent stipulation to the contrary, has accordingly "issued strong admonitions against an expansive reading of section

[*24] 7605(b)." Curtis v. Commissioner, 84 T.C. 1349, 1352 (1985) (citing De-Masters v. Arend, 313 F.2d 79, 87 (9th Cir. 1963)).

Petitioner contends that the "deficiency should be set aside because respondent * * * violated the 'one examination' rule of section 7605(b)." According to petitioner, the review performed by Agent Corbett in 1975 pursuant to the Compliance Project constituted an "inspection of * * * [petitioner's] books of account," with the supposed result that the 2011-2013 gift tax examination was an impermissible "second inspection" under section 7605(b). By way of remedy, petitioner urges that we follow the analysis in Reineman v. United States, 301 F.2d 267 (7th Cir. 1962), and set aside the gift tax deficiency in its entirety. We decline to do so.

At the outset, it is far from clear that Agent Corbett's 1975 review constituted an "inspection of [the] taxpayer's books of account" within the meaning of section 7605(b). "To inspect the 'books of account' would require, at a minimum, that the respondent have access to and physically view a taxpayer's books and records." Benjamin v. Commissioner, 66 T.C. 1084, 1098 (1976), aff'd, 592 F.2d 1259 (5th Cir. 1979). The IRS has long taken the position that narrow, limited contacts between the IRS and taxpayers, such as "compliance checks" and "compliance initiative projects," do not constitute "examinations." See Rev. Proc. 2005-32, 2005-1 C.B. 1206, 1207; Rev. Proc. 94-68, 1994-2 C.B. 803; Internal Revenue

[*25] Manual (IRM) pt. 4.23.3.6 (Jan. 25, 2011) (compliance checks); IRM pt. 4.17.1.2(3) (Feb. 25, 2010) (compliance initiative projects). Compliance initiative projects involve "contact with specific taxpayers and collection of taxpayer data within a group, using either internal or external data to identify potential areas of noncompliance within the group, for the purpose of correcting the non-compliance." IRM pt. 4.17.1.2(3); see Michael Saltzman, IRS Practice and Procedure para. 8.08[3], at 8-69 (July 13, 2013) ("Compliance checks are one specific type of contact not considered by the Service to be an examination[.]").

Agent Corbett contacted petitioner in 1975 as part of the Compliance Project, which the IRS undertook at the request of the Senate Select Committee. The purpose of this project was to determine the extent to which taxpayers were making political contributions that did not comply with rules governing the annual gift tax exclusion. Agent Corbett focused solely on this issue; he exchanged two letters with petitioner and, after receiving copies of cancelled checks and two promissory notes, was satisfied that petitioner was in compliance. Respondent contends that Agent Corbett's contact, given its limited nature, did not amount to an "examination" of petitioner's books of account. Cf. Ellis v. Commissioner, T.C. Memo. 2007-207, 94 T.C.M. (CCH) 112, 116 (holding that IRS letter requesting specific, limited information was not an "examination" even though the taxpayer furnished

[*26] copies of records in response), aff'd in part, rev'd in part on other grounds, 346 F. App'x 346 (10th Cir. 2009).

Even if the 2011-2013 examination constituted a "second inspection," it is far from clear that the remedy would be to expunge the gift tax deficiency that the IRS determined during this examination. The purpose of section 7605(b) is to relieve the taxpayer from unnecessary annoyance, not from payment of taxes legally owed. The IRS is free to conduct a second examination so long as it "notifies the taxpayer in writing that an additional inspection is necessary." Sec. 7605(b). To invalidate a notice of deficiency because the IRS neglected to send this explanatory letter would "substantially overshoot the goal which the legislators sought to attain." United States v. Powell, 379 U.S. at 55. Accordingly, "[i]t has long been established by this Court and others that failure of the Commissioner to comply with the provisions of section 7605(b) * * * does not invalidate a deficiency determined from information derived from such an examination." Flynn v. Commissioner, 40 T.C. 770, 774 (1963). But see Reineman, 301 F.2d at 272. If the taxpayer objects to an IRS contact as an impermissible "second examination," he may "refuse to permit the examination and, should the Service seek enforcement of a summons, oppose the application for enforcement." Saltzman, supra, para. 13.02[5], Westlaw (2013).

[*27] In any event, it is well settled that "if a taxpayer fails to object to a reexamination or second inspection or voluntarily consents to one, he waives any rights conferred by section 7605(b)." Id. As we noted soon after the predecessor of section 7605(b) was enacted: "He might have refused to permit the investigation without notice in writing [from the IRS], but not having done so the protection afforded by the statute will be deemed to have been waived." Estate of Barker v. Commissioner, 13 B.T.A. 562, 566 (1928); accord, e.g., Moloney v. United States, 521 F.2d 491, 501 (6th Cir. 1975); United States v. O'Connor, 237 F.2d 466, 476-477 (2d Cir. 1956); Credit Bureau of Erie, Inc. v. Commissioner, 54 T.C. 726, 729 (1970); Flynn v. Commissioner, 40 T.C. at 774; Philip Mangone Co. v. United States, 54 F.2d 168, 172 (Ct. Cl. 1931).

Agent Cha began his gift tax examination in 2011, and it lasted for more than a year. He requested documents from petitioner on several occasions, and petitioner through his lawyers complied with each such request. Petitioner did not complain at any time during the audit of a potential "second examination" in violation of section 7605(b). He first raised this issue in early 2014, nearly a year after the IRS had mailed the notice of deficiency on which this case is based. Under these circumstances, we conclude that petitioner consented to the 2011-2013 examination and thus waived any rights that section 7605(b) might have afforded him.

**[\*28]** We thus find it unnecessary to decide whether Agent Cha's examination was in fact a "second inspection" of petitioner's books of account or what remedy would be available to him if that question were answered in the affirmative.

II.    Application of Gift Tax

   A.    Governing Legal Principles

During 1972 the gift tax was imposed for each calendar quarter "on the transfer of property by gift" during that quarter.  Sec. 2501(a)(1).  "Where property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift."  Sec. 2512(b).  A necessary corollary of this provision is that a transfer of property in exchange for "an adequate and full consideration" does not constitute a "gift" for Federal gift tax purposes.  See, e.g., Commissioner v. Wemyss, 324 U.S. 303 (1945).  The regulations confirm that "[t]he gift tax is not applicable to a transfer for a full and adequate consideration in money or money's worth, or to ordinary business transactions."  Sec. 25.2511-1(g)(1), Gift Tax Regs.

The regulations define a "transfer of property made in the ordinary course of business" as "a transaction which is bona fide, at arm's length, and free from any donative intent."  Sec. 25.2512-8, Gift Tax Regs.; see Weller v. Commissioner, 38

[*29] T.C. 790, 806 (1962). A transaction meeting this standard "will be considered as made for an adequate and full consideration in money or money's worth." Sec. 25.2512-8, Gift Tax Regs. A transfer of property within a family group normally receives close scrutiny. See, e.g., Frazee v. Commissioner, 98 T.C. 554, 561 (1992). However, a transaction between family members may be treated as one "in the ordinary course of business" if it constitutes an arm's-length transfer of property in settlement of a genuine dispute or otherwise meets the criteria set forth above. See Stern v. United States, 436 F.2d 1327, 1330 (5th Cir. 1971); Rosenthal v. Commissioner, 205 F.2d 505, 509 (2d Cir. 1953), rev'g 17 T.C. 1047 (1951); Estate of Friedman v. Commissioner, 40 T.C. 714 (1963); Beveridge v. Commissioner, 10 T.C. 915, 917-918 (1948); Estate of Anderson v. Commissioner, 8 T.C. 706, 720 (1947).

B.     Sumner's Transfer as a "Gift"

In Estate of Redstone v. Commissioner, 145 T.C. __, __ (slip op. at 31) (Oct. 26, 2015), we held that Edward's June 1972 transfer of stock to his children pursuant to the Settlement Agreement was not a gift but was a "transfer of property made in the ordinary course of business." Sec. 25.2512-8, Gift Tax Regs. We found that a genuine dispute existed concerning Edward's ownership of NAI stock and that he was forced to relinquish his claim to ownership of 33 1/3 shares in

[*30] order to obtain from Mickey and Sumner an acknowledgment of his ownership of the remaining 66 2/3 shares. We held that Edward's transfer of the disputed shares to trusts for his children, at Mickey's insistence, was thus made for a "full and adequate consideration in money or money's worth." Estate of Redstone v. Commissioner, 145 T.C. at __ (slip op. at 31) (citing section 25.2512-8, Gift Tax Regs.).

Three weeks after Edward's litigation was settled, Sumner likewise transferred 33 1/3 NAI shares to trusts for his own children. In contending that this transfer should also be exempt from gift tax, Sumner seeks to portray it as part of the overall reconfiguration of stock ownership by which the parties brought Edward's litigation to a close. "But for the litigation with Edward and the settlement reached by the parties," Sumner submits that he would not have established trusts for his children in July 1972. "By creating trusts he otherwise would not have established at the time," Sumner allegedly "facilitated the settlement of his brother's litigation," "appeased his father," and "poised himself to become NAI's majority shareholder." He accordingly contends that his transfer, like Edward's, was "made in the ordinary course of business" and for "an adequate and full consideration in money or money's worth." Sec. 25.2512-8, Gift Tax Regs.

**[*31]** We do not find this argument persuasive. There is no evidence that any dispute existed in 1971-1972 concerning ownership of Sumner's stock or that Mickey was determined to withhold any of Sumner's shares from him. To the contrary: the evidence showed that Mickey and Sumner were working in concert to drive Edward out of the company and that the "oral trust" theory was a weapon they deployed against Edward in an effort to achieve that goal. Because no demand was ever placed on Sumner's shares, no negotiations ever occurred concerning his ownership of those shares. Sumner never filed a lawsuit, and he received no release of claims from Mickey (or anyone else) upon transferring his stock.

We likewise discern no convincing evidence that Sumner's transfer "facilitated the settlement of his brother's litigation." The Settlement Agreement had been finally executed three weeks before Sumner made his transfer. The Settlement Agreement does not mention any prospective transfer of stock by Sumner, and there is no documentary evidence that his promise to make such a transfer was a condition precedent to the Settlement Agreement. By its terms, the Settlement Agreement imposed no obligations on Sumner except that he execute releases in exchange for reciprocal releases from each of the other parties.[5]

---

[5]In contending that Edward's litigation "was resolved by both Edward and * * * [Sumner] agreeing to transfer 16 2/3 shares of NAI stock to each of their

(continued...)

[*32] Petitioner's transfer of stock to his children was undoubtedly prompted by the Settlement Agreement, both as to its timing and its terms, and this transfer surely pleased Mickey by ensuring the financial security of his four grandchildren on equal terms. But this is not enough to make it a transaction "in the ordinary course of business." Pleasing parents, like pleasing children, is presumptively a family motivation, and we discern no evidence tending to rebut that presumption here. There was no claim against Sumner; there were no arm's-length negotiations; and he received no consideration from anyone in exchange for his transfer.

In transferring stock to the Brent and Shari Trusts, Sumner was essentially motivated by the kinship that he had with his father and his children. Sumner was the sole trustee of both his children's Trusts; there is no evidence that he was

---

[5](...continued)
children," petitioner relies on a statement in a 2004 deposition by Mr. DiGiacomo. When asked to explain how the 1971-1972 dispute was resolved, he stated: "It was resolved by Eddie being deemed the owner of two-thirds of the shares. That is my best recollection. And the other one-third was to be divided between Michael and Ruth Ann. And their shares were held under a trust. Eddie's shares were redeemed by the corporation, and I believe the same applied to Sumner. In other words, Sumner's children had the same proportionate ownership, and that's how the matter was resolved." Mr. DiGiacomo noted in his 2004 deposition that he was providing a high-level summary of distant events of which he had imperfect recollection: "[T]his matter goes back awhile, looking at the file this morning, some of it comes back to me, but without having looked at the file, it would not have." Neither Sumner, Mr. DiGiacomo, nor any other witness in the instant case testified that a promise by Sumner to transfer stock to the Brent and Shari Trusts was a condition precedent to execution of the Settlement Agreement.

[*33] reluctant to effect this transfer or that it disadvantaged him from a business perspective.[6]  The transfer thus bears all the indicia of donative intent toward the natural objects of his affection.

Sumner's testimony in the O'Connor case firmly supports these conclusions. He testified repeatedly, both in deposition and at trial, that his 1972 transfer of stock was completely voluntary.  He stated that he "voluntarily went through the same procedure" as his brother and "gave * * * [his] own children" the stock.  He explained:  "I wanted to do the same thing that my brother did, only he did it as a result of litigation.  I did it voluntarily."  He testified similarly at trial:  "I gave my kids a third of the stock voluntarily, not as a result of a lawsuit.  In [s]o doing, I did what I wanted and appeased my father too."  He emphasized that his shares, unlike Edward's, were "unencumbered" by any litigation claims:  "Eddie was sued.  I was not. * * *  I just made an outright gift."

We find that Sumner's 1972 transfer of stock to the Brent and Shari Trusts was "actuated by love and affection."  Cf. Beveridge, 10 T.C. at 918; Estate of

---

[6]By contrast, Edward was clearly reluctant to transfer stock to his own children's Trusts; for one thing, Sumner, rather than he, was the sole trustee of those Trusts.  Both economic and family reasons motivated Edward to insist on securing outright ownership of (or payment for) all 100 shares that were originally registered in his name.  See Estate of Redstone, 145 T.C. at __ (slip op. at 25 & n.5).

[*34] Noland v. Commissioner, T.C. Memo. 1984-209, 47 T.C.M. (CCH) 1640, 1644-1645. His transfer was animated by donative intent and was not a transaction "made in the ordinary course of business" within the meaning of section 25.2512-8, Gift Tax Regs. It was therefore a taxable gift for Federal gift tax purposes.[7]

C.    Valuation

"If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift." Sec. 2512. The fair market value of property is the price at which it would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 25.2512-1, Gift Tax Regs.; see Rev. Rul. 59-60, 1959-1 C.B. 237. The valuation of property is a question of fact. See Tallichet v. Commissioner, T.C. Memo. 1974-255.

In valuing shares of a closely held corporation, "actual arm's-length sales of such stock in the normal course of business within a reasonable time before or after

_____

[7]Petitioner contends that his transfer was made in the ordinary course of business because he thereby "poised himself to become NAI's majority share-holder." But Sumner had already become NAI's majority shareholder as a result of the Settlement Agreement; his decision three weeks later to transfer 33 1/3 of his 100 shares to his children's Trusts did nothing to enhance his majority position. This transfer could be deemed causally related to his achievement of majority status only if it were a condition precedent to execution of the Settlement Agreement. As explained in the text, we find no convincing evidence that it was.

[*35] the valuation date are the best criteria of market value." Estate of Andrews v. Commissioner, 79 T.C. 938, 940 (1982).  Where actual sale prices are unavailable, stock may be valued by reference to "the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors."  Sec. 25.2512-2(f), Gift Tax Regs.  These factors cannot be applied with mathematical precision; the weight given various factors depends on the particular facts of each case. Estate of Andrews, 79 T.C. at 940-941.

In deciding valuation issues we may consider the opinions of expert witnesses properly admitted into evidence.  Helvering v. Nat'l Grocery Co., 304 U.S. 282, 295 (1938).  If we find one expert's opinion persuasive in its entirety, we may accept his opinion in preference to the opposing expert's.  See Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 452 (1980).  Alternatively, we may reach "an intermediate conclusion as to value" by drawing selectively from the testimony of various experts.  Parker v. Commissioner, 86 T.C. 547, 562 (1986).

1.    Petitioner's Expert

Employing the so-called engrafting method, Mr. Klein valued the shares petitioner transferred in July 1972 by reference to the price NAI paid to redeem the Trusts' shares in March 1984.  Since value is determined as of a specific date, "[o]nly facts reasonably known at the valuation date may serve as the basis for

**[\*36]** valuation." <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 218 (1990). But later occurring events, including later occurring sales of stock, "may be taken into account as <u>evidence</u> of fair market value as of the valuation date." <u>Estate of Jung v. Commissioner</u>, 101 T.C. 412, 431. As a rule, stock transactions post-dating the valuation date are probative only if they occur "within a reasonable time * * * after the valuation date." <u>Estate of Andrews</u>, 79 T.C. at 940; <u>see</u> <u>Estate of Scanlan v. Commissioner</u>, T.C. Memo. 1996-331, 72 T.C.M. (CCH) 160, 162 (considering offers to purchase stock made more than 18 months after the valuation date), <u>aff'd without published opinion</u>, 116 F.3d 1476 (5th Cir. 1997); <u>Jayson v. United States</u>, 294 F.2d 808, 810 (5th Cir. 1961) (considering as not too remote a transaction occurring 3 1/2 years after the valuation date). Petitioner has cited no case in which a court employed, as its principal valuation metric, a stock sale that occurred as many as 12 years after the valuation date.

If we assume arguendo that the 1984 redemption price could be used to determine the value of NAI stock in July 1972, various adjustments would have to be made to take account of changes wrought by the passage of time. These would include "changes in general inflation, people's expectations with respect to that industry, performances of the various components of the business, technology, and the provisions of tax law that might affect fair market values." <u>Estate of Jung</u>, 101

[*37] T.C. at 431-432; Estate of Scanlan, 72 T.C.M. (CCH) at 163.  Here, adjustments between 1972 and 1984 might be required for differences in macro-economic factors (such as inflation, interest rates, and stock market values), industry-specific factors (such as changes in the movie industry), and company-specific factors (such as changes in the mix of NAI's assets or lines of business).

When implementing his valuation methodology, Mr. Klein made no adjustment of any kind to account for differences between the macro-economic, industry-specific, and NAI-specific conditions prevailing in 1984 and those prevailing in 1972.  And he provided no rationale for failing to make these adjustments, stating: "I considered the need for normalization adjustment based on the available data.  None came to mind."  His failure to make (or to show the absence of a need to make) relevant adjustments renders his report altogether unreliable.  We thus have no need to decide whether his "engrafting method" is an acceptable method of valuing closely-held company stock;[8] whether the 1984 redemption was too remote from the July 1972 valuation date to constitute probative evidence; or whether the

_____

[8]Respondent's expert, Mr. Hastings, opines that the "engrafting method" is not a recognized method of valuing corporate stock.  Mr. Klein argues that his method, which employs a ratio between the 1984 redemption price and NAI's net income, resembles the "direct capitalization" method.

[*38] price NAI paid to redeem the Trusts' stock in 1984, contrary to the contentions of the O'Connor plaintiffs, was determined at fair market value.

2.   Respondent's Expert

Respondent's expert, Mr. Hastings, based his valuation of NAI stock as of July 21, 1972, primarily on the price that NAI paid to redeem Edward's stock on June 30, 1972.  Mr. Hastings opined that the $5 million price NAI agreed to pay Edward was negotiated at arm's length, was essentially contemporaneous with Sumner's transfer, and yielded a value of $75,000 per NAI common share.

We agree with Mr. Hastings.  The transaction by which NAI redeemed Edward's shares occurred "within a reasonable time before * * * the valuation date." Estate of Andrews, 79 T.C. at 940.  It thus reflected market conditions approximating those prevalent three weeks later when Sumner made his gift.  In Estate of Redstone, 145 T.C. at __ (slip op. at 22-23), we concluded that the Settlement Agreement pursuant to which NAI redeemed Edward's stock was the result of arm's-length bargaining among Mickey, Sumner, and Edward.  The price at which Edward's stock would be redeemed was a central element of this bargaining, and we conclude that it, in particular, was negotiated at arm's length.

Mickey, Sumner, and Edward were NAI's three principals.  They had worked for NAI for decades and were thoroughly familiar with its financial con-

[*39] dition and prospects. Edward had an economic interest in getting paid as much as possible for his shares, and Sumner and Mickey had an economic interest in paying him as little as possible. All three were represented by counsel, and they negotiated this point for more than a year. We find that the outcome of this negotiation--a per-share price of $75,000--represented the fair market value of NAI common stock as of the valuation date. This yields a value of $2.5 million for the 33 1/3 shares that Sumner transferred to the Brent and Shari Trusts.

3. Petitioner's Arguments

Petitioner advances four arguments in support of his submission that the price NAI paid Edward is not a reliable index of NAI's stock value. First, he contends that the June 30, 1972, redemption transaction cannot be employed under the regulations because Edward and NAI were "under * * * [a] compulsion to buy or sell." See sec. 25.2512-1, Gift Tax Regs. According to petitioner, Mickey and NAI were under a compulsion to buy Edward's shares "because they wanted to prevent Edward from selling his stock to an outsider"; and Edward was under a compulsion to sell because he was supposedly under financial strain.

We find no evidence that the transaction by which NAI redeemed Edward's stock was in any sense a "forced sale." Cf. Heiner v. Crosby, 24 F.2d 191 (3d Cir. 1928) (noting that "forced sales" do not signify fair market value). The parties did

[*40] not act in haste; they negotiated for six months before Edward filed his lawsuits and for another six months thereafter. See Estate of Sharp v. Commissioner, T.C. Memo. 1994-636, 68 T.C.M. (CCH) 1521, 1525 (finding that the existence of business disputes between the selling parties did not mean they "were under any 'compulsion' to sell"). All parties were experienced businessmen, and all had the assistance of able counsel. The leisurely pace of their negotiations suggests that neither side felt compelled to act. As often in litigation, each side held some leverage over the other because of the latter's circumstances. But this does not mean that either was compelled to act. Quite the contrary is true: the possession of leverage over one's opponent is often an incentive to hold out rather than to capitulate.

Second, petitioner points out that Edward did not receive the $5 million redemption price in cash. Rather, he received from NAI a $5 million note payable in quarterly installments over 10 years. Petitioner contends that Edward actually received proceeds worth less than $5 million because NAI's note bore interest at a "below market * * * rate."

There is no factual support for this argument. Edward's note bore interest at the "floating prime rate" charged by the Boston bank from which NAI had obtained most of its financing. NAI's financial statements show that its third-party borrow-

[*41] ings were generally effected at the prime rate. Since the prime rate is the rate at which NAI borrowed from its institutional lenders, it was an arm's-length interest rate that fully compensated Edward for the time value of money and the risk of nonpayment.

Third, petitioner contends that the $5 million redemption price compensated Edward, not only for surrendering 66 2/3 shares of NAI stock, but also for executing releases of the claims he held against NAI, Mickey, and Sumner. We find no merit in this argument. The Settlement Agreement and the Redemption Agreement specifically provided that NAI would purchase Edward's 66 2/3 shares for $5 million, i.e., that this consideration was being paid exclusively for his stock. The releases were provided for separately in the Settlement Agreement. Under section 9 thereof, Mickey, Sumner, NAI, and Edward each released all claims in consideration of the other parties' reciprocal release of claims.

Petitioner has supplied no reason to believe that the releases that he, Mickey, and NAI provided to Edward were less valuable than the releases that Edward provided to them. For example, Mickey originally claimed that the "oral trust" covered half of Edward's 100 shares, whereas Edward claimed outright ownership of all 100 shares. Mickey and Edward released their respective claims pursuant to a compromise by which Edward was deemed the outright owner of 66 2/3 shares.

**[\*42]** With respect to this and other claims, it is impossible to determine whose release was more valuable because the case was settled rather than tried. Assuming as we do that the parties rationally evaluated their respective hazards of litigation, we conclude that the releases each party provided were equivalent in value to the releases that each party received.[9]

Finally, petitioner argues that the price NAI paid to redeem Edward's shares was inflated by a control premium because it "positioned petitioner to obtain control of NAI." We likewise reject this argument. NAI executed the Redemption Agreement with Edward; logically, it would not have paid a "control premium" to acquire its own shares. Sumner had fiduciary duties to NAI's other shareholders, including the beneficiaries of the Grandchildren's Trust, of which he was a trustee. We will not assume that Sumner, in order to advance his own interest, breached his fiduciary duties by causing NAI to pay Edward more than his shares were worth.

---

[9]Petitioner urges that we ascribe value to Edward's agreement to "have nothing further to do with the business or affairs of" NAI. But Edward had voluntarily left his employment at NAI nearly a year before the Settlement Agreement was executed. He made no claims in the NAI Action for damages based on the manner in which his employment ended. In the O'Connor litigation, petitioner agreed that the stock Edward had transferred to his children's Trusts was properly valued at $75,000 per share; he did not contend that the proceeds Edward received included compensation for release of employment or other claims.

**[\*43]** Instead, we accept Mr. Hastings' conclusion that NAI would have agreed to pay Edward no more than the amount he would have received by selling his shares to an unrelated third-party buyer. Far from including a control premium, this amount would incorporate a discount for a lack of marketability, which presumably is reflected in the $5 million redemption price that the parties negotiated at arm's length.[10] There is no evidence that Sumner caused NAI to pay a premium of any kind to acquire Edward's shares.

In sum, we find that the redemption price NAI paid Edward on June 30, 1972, is a reliable index of the stock's value on July 21, 1972, when Sumner made his gifts. Because we find this actual arm's-length transaction to be the best indicator of fair market value, see Estate of Andrews, 79 T.C. at 940, we find it unnecessary to examine the results that could be generated under the "direct capitalization" and "guideline public company" methods, which Mr. Hastings alternatively employed. (After applying a discount for lack of marketability, he determined

---

[10]Petitioner appears to accept this analysis when he agrees that a 34% lack-of-marketability discount should be applied under the direct capitalization method and the guideline public company method, but not under the mergers and acquisitions method (which is exactly how Mr. Hastings applied the discounts). A discount for lack of marketability was not required under the mergers and acquisitions method in this case because it was already factored into the $5 million redemption price.

[*44] under these approaches values of $2,433,608 and $2,997,054, respectively, for the 33 1/3 transferred shares.)

The parties disagree about numerous inputs into these other methodologies, including NAI's cost of equity, the appropriate "beta," the company's expected growth rate, and the universe of comparable companies. These disagreements are not surprising because the valuation date was 43 years ago, the data available from public databases and NAI's own records are inadequate, and it is difficult to find companies comparable to NAI in 1972, which was then (rather incongruously) an entertainment company with much of its value tied up in real estate. Suffice it to say that the $2.5 million valuation we have determined on the basis of the June 1972 redemption price falls comfortably within the range of values that can be generated using various permutations of these other formulas.

III. Additions to Tax

A. Addition to Tax for Fraud

Respondent contends that petitioner is liable under section 6653(b) for an addition to tax for fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. See Goldberg v. Commissioner, 239 F.2d 316, 320 (5th Cir. 1956), rev'g T.C. Memo. 1954-242. Respondent contends that his "assertion of the fraud penalty is based on petitioner's complete failure to explain why, given

**[\*45]** that he knew that there was no preexisting oral trust, \* \* \* [he] did not report this gift and pay gift tax."

Respondent has not met his burden of proof. The oral trust may have been a fiction, but it was a fiction with real-world consequences. Mickey passionately believed in the "oral trust" theory and, at his insistence, it became a central feature of the Settlement Agreement by which Edward's litigation was resolved. To please his father, Sumner adopted the same "oral trust" terminology when making a symmetrical transfer to his own children. There is no evidence that Sumner embraced the "oral trust" concept in an effort to evade his Federal gift tax liabilities.

B.    Other Additions to Tax

Respondent alternatively contends that petitioner is liable for additions to tax under section 6651(a)(1) for failure to file a gift tax return and under section 6653(a) for negligence. In 1972 the Code imposed a 5% addition to tax on any underpayment attributable to "negligence or intentional disregard of rules and regulations." See sec. 6653(a). The question of negligence is one of fact upon which the taxpayer has the burden of proof. Marcello v. Commissioner, 43 T.C. 168, 182 (1964), aff'd in part, remanded in part, 380 F.2d 499 (5th Cir. 1967). A taxpayer may show that his failure to file a return was not negligent if he relied in good faith on advice from a tax professional that no tax liability existed or that no

**[\*46]** return was required.  See Commissioner v. Am. Ass'n of Eng'rs Emp't, Inc., 204 F.2d 19 (7th Cir. 1953) (no addition to tax where taxpayer was advised by a reputable tax attorney that he did not have to file a return); Haywood Lumber & Mining Co. v. Commissioner, 178 F.2d 769, 771 (2d Cir. 1950).

We find that petitioner made the requisite showing of a reasonable cause defense for both additions to tax.  Mr. Rosen, Mr. Isenberg, and the tax professionals at J.K. Lasser were competent tax advisers.  Collectively, they advised Sumner about his gift tax filing requirements on 34 occasions beginning in 1970.  Sumner sought and received their advice concerning the tax consequences of transferring stock to the Brent and Shari Trusts.  The evidence established that Mr. Rosen obtained advice from J.K. Lasser's national office about this transaction; that this advice was memorialized in a letter or memorandum concluding that no gift tax return was required to be filed; that Messrs. Rosen and Isenberg concurred in this conclusion; and that Sumner relied on this advice in good faith.  We conclude that petitioner is not liable for an addition to tax for negligence or for failure to file a gift tax return.

[*47] To reflect the foregoing,

Decision will be entered for

respondent as to the deficiency and for

petitioner as to the additions to tax.